IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

Plaintiff

v.                                          CRIMINAL 09-0096 (DRD)

[1] WALTER ANDUJAR-APONTE, et
al.,

Defendants

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Walter Andujar-Aponte, Moisés Cardona-Pérez, Antonio Rodríguez-Sorrienti, and Gabriel Franki-Irizarry went out to sea in late February of this year and returned on February 25.  They were aboard the M/V Black Sea, a Viking 54 foot-long yacht owned by MDS Caribbean Seas, LTD. and registered in the British Virgin Islands.  Unlike the sailors who went down to the sea in ships, as described in Psalms 107:23-30, these four sailors were not delivered to their desired haven, but rather were arrested and indicted for violating several controlled substances statutes, after 288 kilograms of cocaine were found, not by them, well hidden in the vessel.

This matter is before the court on defendant Walter Andujar-Aponte's Second Motion to Suppress Physical Evidence and Statements filed on June 1, 2009.[1]  (Docket No. 76.)  Also before the court is defendant Anthony Rodríguez-

---

[1]The first motion to suppress was withdrawn.

CRIMINAL 09-0096 (DRD)                    2

Sorrienti's Motion to Suppress Search Warrant under <u>Franks v. Delaware</u>, 438 U.S. 154 (1978) filed on May 20, 2009.  (Docket No. 70.)  The United States filed a response to the motions on June 12, 2009.  (Docket No. 86.)  For the reasons set forth below, it is recommended that these defendants' motions be DENIED.

### I.  Factual and Procedural Background

I submitted a report and recommendation on co-defendant Gabriel Franki-Irizarry's motion to dismiss and/or to suppress on August 21, 2009.  (Docket No. 105.)  To a great extent, I will use that product as a wholesale framework for this and make appropriate changes *mutatis mutandis*.  The following facts are derived from the complaint and accompanying affidavit signed by Immigration and Customs Enforcement ("ICE") Special Agent Francisco J. Gregory (the "complaint affidavit"), (Docket Nos. 3 & 3-2), the affidavit submitted by Special Agent Gregory pursuant to an Application for a Search Warrant, (Docket No. 52-2), the defendants' motions, (Docket Nos. 70 & 76), and the government's response. (Docket No. 86.)

In January 2009, Drug Enforcement Administration ("DEA") agents assigned to the Carribean Corridor Strike Force ("CCSF") learned from a source of information ("SOI") that a sea vessel named the Black Sea would be utilized at some point to smuggle narcotics into Puerto Rico.  (Docket No. 52-2, at 3, ¶ 4.) The Black Sea is a Viking brand 54 foot yacht owned by MDS Caribbean Seas, Ltd.

CRIMINAL 09-0096 (DRD)                3

and registered in the British Virgin Islands.  Around 10:30 p.m. on February 24, 2009, Customs and Border Protection ("CBP") Air Interdiction Agents observed a sea vessel heading east of the south coast of Puerto Rico, "outside U.S. territorial waters."  (Id. at 4, ¶ 7.)  The parties agreed that the boat was traveling through rough seas, and according to the government, "the vessel was traveling at high speeds."  (Docket No. 86, at 2, ¶ 3.)  A CBP Marine Unit was directed towards the vicinity of the vessel, and it ultimately made visual contact with the Black Sea as it entered the Palmas del Mar Marina in Humacao, Puerto Rico.

     CBP Marine Interdiction Agents ("MIA") stopped the Black Sea at a pier within the Marina at approximately 2:00 a.m. on February 25, 2009.  (Docket No. 52-2, at 4, ¶ 7.)  The agents identified and interviewed four men on board, defendants Walter Andujar-Aponte, Moisés Cardona-Pérez, Antonio Rodríguez-Sorrienti, and Gabriel Franki-Irizarry.  There is no indication that any of the four men were placed under arrest at this time, nor is there any indication that they were read their rights under Miranda v. Arizona, 384 U.S. 436 (1966).  Andujar-Aponte identified himself as the vessel's captain.  (Id.)  According to both the complaint affidavit and the warrant affidavit, Andujar-Aponte stated that the men had been fishing approximately twenty-five miles off the coast of Puerto Rico. (Docket No. 3-2, at 1, ¶ 5; Docket No. 52-2, at 4, ¶ 7.)  This is consistent with the

CRIMINAL 09-0096 (DRD)                4

warrant affidavit's averment that the vessel was initially observed "outside U.S. territorial waters."[2]  (Docket No. 52-2, at 4, ¶ 7.)

One crew member said that the vessel had departed from La Parguera, Puerto Rico, while another said it had departed from Ponce, Puerto Rico. According to the government, Andujar-Aponte initially stated the crew had come from La Parguera, but later stated they originated in Cabo Rojo, Puerto Rico. (Docket No. 86, at 2, ¶ 4.)  In light of these discrepancies, the CBP officers opted to conduct a sweep of the boat with a K-9 named Hugo.  (Docket No. 3-2, at 2, ¶ 5; Docket No. 52, at 6, ¶ 1.)   According to the U.S. CBP division of the Department of Homeland Security, Hugo is "reliable in the detection of substances" including cocaine.  (Docket No. 86-3.)  The CBP division states that "[i]t is recommended that [teams including Hugo] be routinely used in all work environments."  (Id.)  Upon inspecting the vessel, Hugo "had a positive hit in the master bedroom deck."  (Docket No. 3-2, at 2, ¶ 5; Docket No. 52, at 6, ¶ 1.) The CBP Contraband Enforcement Team thus proceeded to conduct a search of the vessel, but had found no contraband by the time the agents concluded the search in the morning hours of February 25, 2009.  The government states that

_____

[2] Per Presidential proclamation, the United States territorial waters extend twenty-four miles beyond the shore.  Proc. No. 7219, 64 Fed. Reg. 48,701 (Aug. 2, 1999); United States v. de León, 270 F.3d 90, 91 n.1 (1st Cir. 2001).

CRIMINAL 09-0096 (DRD)                    5

the crew members were free to leave at this point, and defendants do not contend

otherwise.  (Docket No. 86, at 3, ¶ 4.)

On February 26, 2009, a group of agents from ICE, CCSF, and CBP returned

to the Black Sea.  The government contends that only two of the four defendants

were present at that time:  Andujar-Aponte and Cardona-Pérez.  (Docket No. 86,

at 3-4; Docket No. 3-2, at 2, ¶ 6.)  The government states that Franki-Irizarry

was "not present when [the] agents returned on February 26, 2009 or in the next

several days as the search continued."  (Docket No. 86, at 9, ¶ 3.)  Defendant

does not contend otherwise.  In all events, CBP officers informed the crew that the

proper border entry requirements had not been completed for the vessel, and the

agents proceeded to begin searching the boat again.  In the master bedroom of

the cabin, agents found ten brand new black duffle bags, several packages of

Ziploc brand bags, one package of vacuum sealer bags, and several plastic bottles

of odor wipes.  (Docket No. 52-2, at 4, ¶ 8.)  The affidavit states that these items

were "consistent with recent seizures made on pleasure vessels used to smuggle

narcotics."  (Id. at 4-5, ¶ 8.)  No narcotics were found on this day, however, and

the search concluded at 8:00 p.m.

The following day, February 27, 2009, MIA and CBP officers contacted

Andujar-Aponte and requested that he and his crew be present at the vessel for

another inspection.  Andujar-Aponte stated that he would not return to the vessel.

1

2

CRIMINAL 09-0096 (DRD)                 6

3

4

(Docket No. 3-2, at 2, ¶ 7.)  The government contends that none of the four

5

defendants ever returned to the vessel and neither the complaint affidavit, the

6

warrant affidavit, nor defendant's brief states otherwise.  (Docket No. 86, at 4.)

7

MIA officers transported the vessel to Marina Puerto del Rey Marina and placed it

8

9

in dry dock.  The agents received further information corroborating their initial

10

SOI that narcotics were aboard the vessel, but concluded the investigation on that

11

day without finding any contraband.

12

        Another more invasive search took place on February 28, 2009.  According

13

14

to the defendant, customs agents "destroyed the ceilings, the bathrooms, the

15

doors, drilled holes in the fuel tank, drilled holes in other tanks, cut holes in the

16

walls, broke the beds, broke the seats, removed the doors, many systems made

17

unusable [sic], etc."  (Docket No. 52, at 2.)  The search was unavailing.  No

18

search took place on Sunday, March 1, 2009, and the agents were nearing

19

20

conclusion of their search on March 2 when they received further information

21

indicating that narcotics were aboard the vessel.  Based on the facts and

22

information obtained to that point, CCSF Agents applied for a search warrant to

23

perform a more invasive search of the vessel.  (Docket No. 52-2.)  The warrant

24

25

was signed on March 3, 2009.  On March 4, CCSF agents and CBP officers

26

resumed the search and found a total of two hundred eighty-eight kilograms of

27

28

CRIMINAL 09-0096 (DRD)                7

cocaine packed behind shower stall fixtures in the two bathrooms within the vessel.  (Docket No. 3-2, at 2, ¶ 10; Docket No. 86, at 5-6; Docket No. 86-4.)

On March 5, 2009, CCSF agents obtained a criminal complaint against and warrants for the arrest of the defendants.  At approximately 6:00 p.m. that day, defendant Franki-Irizarry self-surrendered to federal agents in Joyuda, Puerto Rico.  (Docket No. 86, at 6.)  He was immediately transferred to the CBP facility in Aguadilla, Puerto Rico, where he was informed of his rights and signed a form waiving those rights.  He stated that he was responsible for cleaning the Black Sea and had never been outside of Puerto Rico aboard the vessel.  The government contends, however, that according to CCSF agent investigation, the Black Sea arrived in La Romana, Dominican Republic, on February 14, 2009, and that Franki-Irizarry had been on board the vessel at that time.  (Docket No. 86, at 6.) According to the government, he was also on board the vessel when it departed from the Dominican Republic.  The government states that a GPS device aboard the Black Sea demonstrates that a trip to the Dominican Republic in February 2009 had been planned for the vessel.    (Docket No. 86, at 7.)  According to information evidently available on the device, the vessel was headed to that country, but the device was turned off on February 14, 2009.  In any event, Mr. Franki-Irrizary was arrested on March 5, 2009 and appeared before a magistrate judge on the afternoon of March 6, 2009.

CRIMINAL 09-0096 (DRD)                8

A federal grand jury returned a seven-count indictment against the four defendants on March 11, 2009.  (Docket No. 17.)  Defendants are charged with knowingly and intentionally possessing with intent to distribute five kilograms or more of a substance containing cocaine, a Schedule II Narcotic Drug Controlled Substance.  21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii), 846; 18 U.S.C. § 2.  They are also charged with conspiring to import and importing the same into the United States.   21 U.S.C. §§ 952(a), 960(a)(1), 960(b)(1)(B), 963; 18 U.S.C. § 2. Finally, they are charged with possession of a controlled substance on board a vessel subject to the jurisdiction of the United States and with conspiring to do so. 46 U.S.C. §§ 70502(c)(1)(D), 70503(a)(1), 70504(b)(1), 70506(b); 18 U.S.C. § 2.  The government seeks forfeiture of assets upon conviction.  21 U.S.C. §§ 853, 881; 46 U.S.C. § 70507.

Defendant Franki-Irizarry had previously sought dismissal of the importation charges against him under 21 U.S.C. § 952(a); suppression of evidence obtained through a warrantless search; suppression of evidence gathered through a warrant that was obtained in violation of the Fourth Amendment, United States Constitution; a hearing regarding the same under Franks v. Delaware, 438 U.S. 154 (1978); suppression of statements by defendant allegedly obtained in violation of the Fourth and Fifth Amendments, United States Constitution; a finding that the government violated Rule 5 of the Federal Rules of Criminal

CRIMINAL 09-0096 (DRD)                    9

Procedure by unnecessarily delaying his appearance before a magistrate judge; and, a finding that he does not qualify as an expert witness regarding the painting or repair of boats pursuant to Rule 702 of the Federal Rules of Evidence.  I issued a report and recommendation that his requests be denied. (Docket No. 105.)

        Now co-defendant Anthony Rodríguez-Sorrienti argues that the affidavit by agent Francisco J. Gregory contained material allegations that were knowingly or recklessly false and misleading, in violation of Franks v. Delaware, 438 U.S. 154 (1978).  (Docket No. 70, at 1, ¶ 3.)  As a result, he argues that the evidence seized should be suppressed.  (Id. at 2, ¶ 4.)  Contrary to what the supporting affidavit stated at paragraph 7, the defendant argues that the vessel was not sighted in international waters and that a discovery package contains a photo taken on February 24, 2009 at 22:54 hours showing coordinates 17:52:13N and 66:11:55W, which places the vessel at approximately 3.5 miles from the Aguirre ward, Salinas, Puerto Rico and not even remotely in international waters. (Docket No. 70, at 5, ¶¶ 15 & 16.)  Since there is only a four-minute difference between the time stamp on this picture and the time reflected in the affidavit when the boat was sighted in international waters, the defendant argues that a material falsehood exists in the affidavit.  (Id. ¶ 17.)  The defendant also attacks the inconsistencies in the statements as an excuse to conduct a search since the information already in the hands of law enforcement officers made the ultimate

1

2

CRIMINAL 09-0096 (DRD)                    10

3

4

search of the vessel a foregone conclusion which did not hinge on those

5

inconsistencies, which he argues did not actually occur.  (Docket No. 70, at 5.)

6

This is because the only post-arrest statement disclosed was that of co-defendant

7

Franki-Irizarry who denied being in international waters.[3]   Since there are no

8

9

other statements of any weight produced under Federal Rule of Criminal

10

Procedure 16, the statement in the affidavit is arguably false.  (Id. at 6, ¶¶ 21-

11

23.)  The defendant argues that the affidavit makes it appear that the search of

12

the vessel was consensual.  (Id. at 7, ¶ 25.)  In relation to the alterations made

13

14

to the vessel for smuggling, the defendant argues that the vessel was inspected

15

on April 29, 2009 and upon inquiry made relating to the modification made to the

16

tanks of the vessel, the attorney was informed by the prosecutor that there were

17

no modifications to the tanks nor were there different paint jobs on the tanks.  (Id.

18

19

at 7-8, ¶ 29.)  The defendant also attacks the lack of corroboration of the source

20

of information related to the vessel, and stresses that the source was insufficiently

21

evaluated in relation to its trustworthiness.  (Id. at 8.)  He concludes that the

22

good faith exception created by United States v. León, 468 U.S. 897 (1984), does

23

not apply here because the affidavit lacks any indicia of reliability, particularly

24

25

since it is a deliberately recklessly false affidavit.  (Id. at 9, ¶ 38.)  He stresses

26

----

27

[3] There are statements of Andujar-Aponte and Cardona-Pérez but they are
arguably not inconsistent with the statement of Franki-Irizarry who apparently
28

stated they had left the Lajas, Puerto Rico area.

CRIMINAL 09-0096 (DRD)                    11

that a hearing would show the details of the recklessness and deliberate falsehoods in the affidavit.  (Id. at 10, ¶¶ 39 & 40.)

Co-defendant Walter Andujar-Aponte on the other hand argues that Agent Gregory's affidavit says nothing about the Black Sea being located outside of territorial waters, but only that the target vessel was located on the east coast of Puerto Rico.  (Docket No. 76, at 2, n.2.)  The defendant contends that the warrantless search which began on February 25 and continued until March 2, 2009, was unconstitutional unless it was a bona fide border search.  (Id. at 9, ¶ 3. )  The defendant argues that the border search became fictional because he as well as the other defendants were allowed to go their ways while the vessel's master deck was being dismantled.  (Id. at 10, ¶ 2.)  According to the defendant once an individual exits a vessel that brought him into the United States, and passes through Customs, the fiction is over, and the customs area loses its quality as a functional equivalent of a border.  Otherwise, the defendant argues that the dock becomes a permanent zone of lesser Fourth Amendment protection where any person passing from shore to the boat could be seized and that person's belongings searched.  (Id. at 10-11, ¶ 3) (citing United States v. Caraballo, 917 F. Supp. 138, 141 (D.P.R. 1996).

The defendant also argues that upon being questioned by CBP officers, he stated that they were fishing about 25 miles offshore and that such a statement

CRIMINAL 09-0096 (DRD)                    12

appears to be the basis for the filing of the charges as alleged in counts three and count four of the indictment.  (Id. at 11, ¶ 4.)  The defendant contends that all of the statements he made at the dock were made when he was detained without any procedural safeguards being used.  (Id. at 12, ¶ 1.)  It was not until March 5, 2009 that law enforcement officers warned him of his right to remain silent, and that any statement he made could be used as evidence against him.  (Id.)  He concludes that these statements cannot be used against him.  (Id.)

The United States notes that when the Black Sea was being tied to the dock, Walter Andujar-Aponte was identified as the captain of the vessel.  (Docket No. 86, at 2, ¶ 4.)  He allegedly stated at the time that they were coming from La Parguera, then Cabo Rojo, and that they were fishing 25 miles southwest of Lajas. (Id.)  Franki-Irizarry also said that they were fishing 25 miles offshore. (Id. at 2-3, ¶ 5.)  With this information, the agents proceeded to conduct a border inspection. (Id.)  A K-9 later gave a positive hit to the odor of narcotics.  (Id. at 3, ¶ 2.)  No drugs having been found, the defendants were allowed to leave the vessel.  (Id. ¶ 4.)  Based upon a reliable source of information, that the vessel was used to smuggle narcotics, CBP agents returned to search the vessel.  (Id. ¶ 5.)  Co-defendants Andujar-Aponte and Cardona-Pérez were cleaning the vessel.  (Id. at 4, ¶ 1.)  The CBP officers asked co-defendant Andujar-Aponte for his border entry clearance release number, to prove that he had cleared Customs.  (Id.)  There

CRIMINAL 09-0096 (DRD)                13

was no release number and the agents continued with the vessel inspection. (Id.) Upon reinspection, in the master bedroom of the vessel, agents found a suitcase containing ten brand new black duffle bags, several packages of Ziploc brand bags, one package of vacuum sealer bags, and several plastic bottles of odor wipes. (Docket No. 52-2, at 4, ¶ 8.) The duffle bags were not present during the first inspection. (Docket No. 86, at 4, ¶ 2.) Fuel tanks were inspected with negative results. (Id. at 5, ¶ 2.) A search warrant was sought on March 3, 2009 because of information received that there were narcotics aboard. (Id. ¶ 4.) The search was resumed on March 4, 2009. (Id. ¶ 5.) Cocaine was found later that day, and a complaint was filed on March 5, 2009. (Id. at 6, ¶¶ 2 & 3.) The two moving co-defendants made no post-arrest statements. (Id. ¶ 4.)

## II.  DISCUSSION

### A.  Warrantless Search

Co-defendant Walter Andujar-Aponte does not contend  that from the time he and the other defendants were detained, while on board the vessel on February 25, 2009, Palmas del Mar Marina became the functional equivalent of a border.  What he does argue is that what was allegedly a border search in its inception became a fiction when he and the other defendants were allowed to go their ways after no illegal contraband was found, wile the Black Sea remained docked. (Id. at 10, ¶ 2.) The United States on the other hand holds that the

CRIMINAL 09-0096 (DRD)                14

border search was still in effect because the entry reporting requirements were never completed.  (Docket No. 86, at 4, ¶ 1.)

"The border search exception provides that routine searches of persons and effects at borders are permitted without the requirement of probable cause." United States v. Momoh, 427 F.3d 137, 143 (1st Cir. 2005) (citing United States v. Ramsey, 431 U.S. 606, 619 (1977)).  "Since the founding of our Republic, Congress has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country." United States v. Montoya de Hernández, 473 U.S. 531, 537 (1985) (citing United States v. Ramsey, 431 U.S. at 616-17) (citing Act of July 31, 1789, ch. 5, 1 Stat. 29)).  Statutory authority for the border search exception comes from Section 1581 of United States Code Title 19:

> Any officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States or within the customs waters . . . and examine, inspect, and search the vessel or vehicle and every part thereof and any person, trunk, package, or cargo on board, and to this end may hail and stop such vessel or vehicle, and use all necessary force to compel compliance.

19 U.S.C. § 1581(a); United States v. Victoria-Peguero, 920 F.2d 77, 80 (1st Cir. 1990); United States v. Zurosky, 614 F.2d 779, 787 n.7 (1st Cir. 1979).

CRIMINAL 09-0096 (DRD)                    15

Under the exception, officials may conduct an extended, warrantless border search if "officials have reasonable certainty or a high degree of probability that a border was crossed," United States v. Pérez-Rivera, 247 F. Supp. 2d 108, 115 (D.P.R. 2003), and if the search satisfies "the constitutional requirement of reasonableness."   United States v. Victoria-Peguero, 920 F.2d at 80. Furthermore,  "[t]he extended border search doctrine allows for a greater spatial and temporal distance from the border than a search at the functional equivalent of the border. Thus, the courts have authorized border searches under this extended border concept in a variety of factual circumstances." United States v. Pérez-Rivera, 247 F. Supp. 2d at 115.  In other words "under the extended border search doctrine, 'searches need not necessarily occur at the instant a vehicle arrives at the border or at its functional equivalent.'" Id. at 116 (quoting United States v. Alfonso, 759 F.2d 728, 735 (9th Cir. 1985)).  Also, "the fact that some search occurred at the time of the initial border crossing simply does not prevent later searches from coming under the rules of border searches." United States v. Pérez-Rivera, 247 F. Supp. 2d at 116 (emphasis omitted).

Under the extended border search doctrine a warrantless search may be conducted "beyond the border or its functional equivalent if the following three factors are satisfied:  1) the officials have reasonable certainty or a high degree of probability that a border was crossed; 2) they also have reasonable certainty

CRIMINAL 09-0096 (DRD)                16

that no change in the object of the search has occurred between the time of the border crossing and the search; and 3) they have reasonable suspicion that criminal activity was occurring." <u>United States v. Pérez-Rivera</u>, 247 F. Supp. 2d at 115 (citing <u>United States v. Cárdenas</u>, 9 F.3d 1139, 1148 (5th Cir. 1993)) (emphasis omitted).

        The first issue is whether the agents in this case had "reasonable certainty" or "a high degree of probability" that a border was crossed.  "The sea boundary of the United States territory is a marine league (three geographic miles) from shore, <u>Cunard S.S. Co. v. Mellon</u>, 262 U.S. 100, 122 (1923), and comprises a border for fourth amendment purposes." <u>United States v. Victoria-Peguero</u>, 920 F.2d at 80 (citing <u>United States v. Zurosky</u>, 614 F.2d at 787 n.7) ("[T]he three mile limit [off the U.S. coast] establishes the boundary of the territorial sea and is regarded as the border.")).  Here, the CBP and MIA initially spotted the Black Sea "outside U.S. territorial waters," that is, over twenty-four miles beyond the shore.  (Docket No. 52-2, at 4, ¶ 7.)  At least one of the crew members told CBP officers that the men had been "fishing approximately twenty five (25) miles offshore." (Docket Nos. 3-2, at 1, ¶ 5; 52-2, at 4, ¶ 7; 86, at 2, ¶ 4.)  Defendant does not deny in his brief that the vessel was over three miles beyond the coast.  Finally, CCSF intelligence indicated that the Black Sea "was going to be utilized to smuggle narcotics *into Puerto Rico*." (Docket No. 52-2, at 3, ¶ 4.) (Emphasis

CRIMINAL 09-0096 (DRD)                17

added.)  The information as a whole was sufficient to establish a "high degree or probability" and even "reasonable certainty" that the Black Sea had crossed a border.

It is also evident that CBP agents had a reasonable certainty that no change in the vessel occurred between the time it crossed the border and the time the search was conducted.   Defendant Andujar-Aponte however argues that the search conducted by CBP agents on February 26, 2009, was unconstitutional because he was allowed to go the day before after the CBP agents were not able to find any contraband aboard the Black Sea.   The defendant relies on United States v. Caraballo, 917 F. Supp. 138 (D.P.R. 1996), to support the argument. However, I find that the court's decision in Caraballo is not controlling in this case. In Caraballo the court held that a search of a cruise ship crew member who was returning to the ship after several hours on shore did not qualify as an extended border search, because the government could not prove that the items seized from the crew member had crossed the border and remained unchanged between the time the border was crossed and the time of the search.   United States v. Caraballo, 917 F. Supp. at 140.  That is not the case here.  In this case contrary to what happened in Caraballo, CBP agents searched the Black Sea while it was docked at Palmas del Mar Marina.  After the vessel was intercepted by CBP agents on February 25, 2009, it remained at all times at the marina until February 27,

CRIMINAL 09-0096 (DRD)                18

2009, when it was taken by CBP agents to the Marina Puerto del Rey in Fajardo. Thus, contrary to what happened in <u>Caraballo</u>, here the evidence was found inside the vessel and not on the defendant. Hence, there is no question that the items that were seized from inside the vessel had crossed the border and remained unchanged between time of border crossing and time of the search.

The CBP agents also operated under the reasonable suspicion of criminal activity. <u>United States v. Montoya de Hernández</u>, 473 U.S. at 537 (citing <u>New Jersey v. T.L.O.</u>, 469 U.S. 325, 337-42 (1985) ("What is reasonable depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself.")). Defendant Andujar-Aponte does not contend otherwise. While reasonable suspicion may develop prior to government agents' boarding a vessel, suspicion may also "be formed on the basis of facts obtained during the safety and document inspection . . . . " <u>United States v. Cardona-Sandoval</u>, 6 F.3d 15, 23 (1st Cir. 1993). The evidence demonstrates that the CBP agents operated pursuant to a reliable source of information that indicated the Black Sea was being used to traffic narcotics. After the boarding of the vessel, crew members delivered discrepant accounts of the boat's port of origin. (Docket No. 52-2, at 4, ¶ 7.) During the inspection, a K-9 gave a positive indication of the presence of cocaine. Accordingly, the agents had reasonable suspicion that criminal activity was taking place. See <u>United States v. Montoya de Hernández</u>,

CRIMINAL 09-0096 (DRD)                    19

473 U.S. at 542 (quoting <u>New Jersey v. T.L.O.</u>, 469 U.S. at 346)  (sixteen hour extended border search was warranted where customs inspectors "had encountered many alimentary canal smugglers" and where "inspectors' suspicion" that defendant was such a smuggler was nothing more than a "'common-sense conclusio[n] about human behavior' upon which 'practical people,' –including government officials, are entitled to rely.").

Not only was the border search itself appropriate, but its location in the marina at Palmas del Mar was also justified.  "Because it is not practical to set up checkpoints at the outer perimeter of a country's territorial waters, courts have consistently recognized the constitutionality of warrantless searches at the functional equivalent of the sea border . . . . " <u>United States v. Victoria-Peguero</u>, 920 F.2d at 80 (police boarding and search of vessel approximately 1.5 miles off the coast was appropriate) (citing <u>United States v. Tilton</u>, 534 F.2d 1363, 1365-66 (9th Cir. 1976) ("harbor as functional equivalent of border")).  "The border search exception is not limited to searches that occur at the border itself but includes searches that take place at the 'functional equivalent' of a border . . . . " <u>United States v. Momoh</u>, 427 F.3d at 143.  The functional equivalent of a border includes a marina.  <u>United States v. Thomas</u>, 257 F. Supp. 2d 494, 497 (D.P.R. 2003) ("That the search occurred in the pier 10 area does not render it unreasonable, for it serves as the functional equivalent of the border.").  Here, it would not have

CRIMINAL 09-0096 (DRD)                20

been practicable for customs to set up a check point exactly at the three miles distance from the coast.  A search in the protected Palmas del Mar marina was far more reasonable.  Thus, under United States v. Thomas, the border search in that marina was appropriate under the Fourth Amendment.

### B.  Suppression of Statements

Andujar-Aponte next argues that the statements he made to customs agents on February 25, 2009 should be suppressed because they were made while being detained at Palmas del Mar Marina without any procedural safeguards being used to guarantee that he had been informed of, and freely waived the Constitutional privileges of the Fifth Amendment.

"The Fifth Amendment requires that an accused in custody be informed of important constitutional rights before the authorities interrogate him." Oregon v. Elstad, 470 U.S. 298, 347 (1985).  "This requirement serves to combat the 'inherently compelling pressures' of custodial questioning 'which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely,' and is a prerequisite to securing the accused's informed and voluntary waiver of his rights."  Id. at 347-48 (quoting Miranda v. Arizona, 384 U.S. at 467).  "Far from serving merely as a prophylactic safeguard, '[t]he requirement of warnings and waiver of rights is a fundamental with respect

CRIMINAL 09-0096 (DRD)                21

to the Fifth Amendment privilege . . . . '" <u>Id.</u> at 347 (quoting <u>Miranda v. Arizona</u>, 384 U.S. at 476).  Accordingly, the court in <u>Stansbury v. California</u> held that:

> [A] person questioned by law enforcement officers after being "taken into custody or otherwise deprived of his freedom of action in any significant way" must first "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."  Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial.  An officer's obligation to administer <u>Miranda</u> warnings attaches, however, "only where there has been such a restriction on a person's freedom as to render him 'in custody.'"  In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but "the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."

<u>Stansbury v. California</u>, 511 U.S. 318, 322 (1994) (citations omitted).  However, "[i]t is well recognized that a routine inspection and boarding of an American flagship vessel . . . does not give rise to a custodial detention."  <u>United States v. Vilches-Navarrete</u>, 523 F.3d 1, 15 (1st Cir. 2008) (quoting <u>United States v. Elkins</u>, 774 F.2d 530, 535 n.3 (1st Cir. 1985)).  This is true even where defendants are "confined to one section of the boat during [a] lengthy Coast Guard inspection . . . . "  <u>United States v. Elkins</u>, 774 F.2d at 535 n.3; <u>United States v. Nai Fook Li</u>, 206 F.3d 78, 83 (1st Cir. 2000) (Coast Guard's boarding and inspection of ship with the crew's consent was not custodial in nature, even where crew was

CRIMINAL 09-0096 (DRD)                    22

relegated to one section of ship) (citing United States v. Rioseco, 845 F.2d 299, 303 (11th Cir. 1988)).

Andujar-Aponte's contention that he was detained is of no consequence because as in this case the defendants in United States v. Nai Fook Li and United States v. Rioseco were detained when they were relegated to a certain section of the ship.  The agents in those cases never placed any crew members under arrest, and defendants were free to go within hours of the vessel's being boarded.  Cf. United States v. Cardona-Sandoval, 6 F.3d at 21 (defendants detained in a barred cage during part of a six-day search).  Here, the CBP agents boarded the Black Sea and performed a routine inspection. Andujar-Aponte as well as the other defendants were not in custody for purposes of Miranda.  Thus, the statements made by Andujar-Aponte to CBP agents need not be suppressed.

C.  Search Warrant

Co-defendant Anthony Rodríguez Sorrienti contends that the search warrant was based upon an affidavit that contained material allegations that were knowingly or recklessly false and misleading, in violation of Franks v. Delaware, 438 U.S. 154 (1978).  (Docket No. 70, at 1, ¶ 3.)  The defendant further argues that the good faith exception does not apply here because the government was not acting in objective good faith.  (Id. at 2, ¶ 4.)  Thus, the defendant believes that the evidence seized pursuant to the warrant should be suppressed.  Id.  The

CRIMINAL 09-0096 (DRD)                23

defendant therefore requests a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978).

"A defendant is entitled to an evidentiary hearing under [Franks v. Delaware] where the defendant 'makes a substantial preliminary showing' that both (1) 'a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit' and (2) 'the allegedly false statement is necessary to the finding of probable cause.'" United States v. Reiner, 500 F.3d 10, 14 (1st Cir. 2007), cert. denied, 128 S. Ct. 1737 (2008) (quoting Franks v. Delaware, 438 U.S. at 155-56).  Both elements are essential to establish the necessity of a Franks hearing.  However, even "when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." Franks v. Delaware, 438 U.S. at 171-72.

The defendant focuses on four particular statements that according to him are false, and were included knowingly and intentionally and/or with reckless disregard for the truth in the affidavit.  First, the defendant argues that the Black Sea was not sighted outside United States territorial waters because according to the co-ordinates shown in a photograph taken by a law enforcement airborne asset, the vessel was approximately 3.5 miles from Aguirre ward, Salinas, Puerto

CRIMINAL 09-0096 (DRD)              24

Rico.   Second, the defendant states that there are no conflicting statements because the United States has only disclosed a report of investigation of a post arrest interview by co-defendant Gabriel Franki Irrizary, which did not make any reference as to having traveled outside United States waters.   Third, he argues that the court was misled into believing that the search of the Black Sea was by consent, or that an absolutely warrantless search was being held because the affidavit failed to state that the vessel had been seized by ICE.   Fourth, he argues that no alterations were made to the boat because attorney Ramón Garay was informed that there were no modifications to the tanks, nor were there different paint jobs on the tanks.   However, the defendant failed to establish that these statements were necessary in finding probable cause.

In this case there is no need for an evidentiary hearing because when the statements which are the subject of the alleged falsity or reckless disregard are set aside, the fact is that there still remains sufficient content in the warrant affidavit to support a finding of probable cause.   There were at least two sound bases for finding probable cause to justify the search warrant, and defendant does not challenge the veracity or reliability of either.   First, the K-9 Hugo gave a positive indication of the presence of narcotics aboard the vessel.   According to the Department of Homeland Security, the K-9 was "reliable in the detection of [cocaine] . . . . " (Docket No. 86-3.)  A "positive alert from a canine sniff may be

CRIMINAL 09-0096 (DRD)              25

used as probable cause to obtain a warrant . . . . " United States v. Carreras, 851 F. Supp. 502, 505 (D.P.R. 1994) (citing United States v. Sokolow, 490 U.S. 1 (1989)) ("probable Cause [sic] to arrest individuals suspected of transporting illegal drugs in an airport may be proven with 'evidence of a strong alert by a narcotics dog [to the odor of drugs in a specific container], evidence that the dog was reliable and evidence linking the container to the individual arrested.'") (quoting United States v. Colón, 845 F. Supp. 923, 928 (D.P.R. 1994)).  As such, the evidence from the K-9 alone was sufficient to justify the search warrant and no other statement in the affidavit was necessary to the finding of probable cause. Defendant fails to contest the reliability or veracity of the dog's alert, and therefore fails to identify a false statement within the affidavit necessary to the finding of probable cause.  See United States v. Brown, 500 F.3d 48, 57 n.3 (1st Cir. 2007)

A second legitimate basis for the issuance of the warrant was the affidavit's reference to the ten brand new black duffle bags, several packages of Ziploc brand bags, one package of vacuum sealer bags, and several plastic bottles of odor wipes.  (Docket No. 52-2, at 4, ¶ 8.)  "[T]he presence on the same premises of an unusually large number of zip lock plastic bags . . . combined with [an agent's] extensive experience as a law enforcement officer [may] plainly buttress[ ] the informant-based indicia of probable cause." United States v. Taylor, 985 F.2d 3,

CRIMINAL 09-0096 (DRD)                26

6 (1st Cir. 1993).  Here, the presence of several packages of Ziploc brand bags, vacuum sealer bags, and several bottles of odor wipes is certainly unusual and appears inconsistent with defendants' ostensible reason for the sea voyage:  a fishing excursion.  The items are "consistent with recent seizures made on pleasure vessels used to smuggle narcotics" according to the warrant affidavit by ICE Special Agent Gregory.  (Docket No. 52-2, at 4-5, ¶ 8.)  Special Agent Gregory has been a special agent with ICE for seven years, and "the issuing magistrate properly may credit the experience and pertinent expertise of a law enforcement affiant in evaluating the authenticity of the informant's description of the target's modus operandi."  United States v. Taylor, 985 F.2d at 6 (finding warrant affidavit sufficiently supported probable cause to search defendant's premises).  Much like the affidavit's averments as to the K-9, the allegation that various bags and deodorizing items were aboard the Black Sea was sufficient in itself to provide probable cause for a search warrant.  Defendant does not contest the veracity or reliability of that allegation, and he is therefore not entitled to a Franks v. Delaware hearing.

        D.  Lack of Corroboration of the Source of Information

        Rodríguez-Sorrienti further argues that:  (1) the affidavit makes continuous reference to a source of information but that it cannot be determined if it is referring to a single source of information or to various individuals; (2) the

CRIMINAL 09-0096 (DRD)                    27

affidavit provides no reference about any actions taken by the officers to evaluate the credibility of the source of information; (3) the source was not personally interview by agent Watson; (4) no evaluation was made of the source's background to adequately evaluate his trustworthiness; (5) there is no information about the sources's prior record, or the reason why he knew the information.

"'Probable cause exists when "the affidavit upon which a warrant is founded demonstrates in some trustworthy fashion the likelihood that an offense has been committed and that there is sound reason to believe that a particular search will turn up evidence of it" or that the search will turn up contraband.'" United States v. Stewart, 183 F. Supp. 2d 91, 101 (D. Me. 2002) (quoting United States v. Schaefer, 87 F.3d 562, 565 (1st Cir. 1996) (quoting United States v. Aguirre, 839 F.2d 854, 857-58 (1st Cir.1988)). "An affidavit supporting a request for a search warrant must give the reviewing judge a 'substantial basis' upon which to conclude that there is such a 'fair probability.'" United States v. Stewart, 183 F. Supp. 2d at 101 (quoting Illinois v. Gates, 462 U.S. 213, 238-39 (1983)). Where the finding of probable cause depends on information supplied by an informant, courts review the determination in light of the fallowing factors:

> whether an affidavit supports the probable veracity or basis of knowledge of persons supplying hearsay information; whether informant statements are self-authenticating; whether some or all of the informant's

CRIMINAL 09-0096 (DRD)               28

> factual statements were corroborated wherever reasonable and practicable (*e.g.,* through police surveillance); and whether a law-enforcement affiant included a professional assessment of the probable significance of the facts related by the informant, based on experience or expertise.

United States v. Torres-Rosario, 588 F. Supp. 2d 128, 131 (D. Mass. 2008) (quoting United States v. Zayas-Díaz*,* 95 F.3d 105, 111 (1st Cir. 1996)).  Since "[n]one of these factors [are] indispensable . . . stronger evidence on one or more factors may compensate for a weaker or deficient showing on another."  Id*.* "When an affidavit relies on the reports of unnamed informants, it must include some information by which the reviewing judge can assess the credibility of the information those informants provide."  United States v. Stewart, 183 F. Supp. 2d at 101 (citing United States v. Capozzi, 91 F. Supp. 2d 423, 431 (D. Mass. 2000) (citing Illinois v. Gates, 462 U.S. at 227).  "It is not necessary for a warrant affidavit to state an informant's previous reliability; rather the appropriate inquiry is whether the informant's present information is truthful or reliable."  United States v. Stewart, 183 F. Supp. 2d at 101 (citing United States v. Harris, 403 U.S. 573, 581-82 (1971)).

In this case the government failed to provided any background information on its sources of information.  The information provided by the SOI's reliability and credibility is neither supported nor referred to in the affidavit.  This however does not mean that the affidavit failed to establish probable cause to search the

CRIMINAL 09-0096 (DRD)                    29

vessel for evidence of contraband since the finding of probable cause does not rely solely on the information provided by the SOI.  The affidavit recounts the events that had taken place which ultimately lead to believe that the Black Sea was being used for smuggling narcotics into Puerto Rico.  First, the affidavit states the CBP officers observed the Black Sea traveling at high speeds through rough seas, at around 10:30 p.m. on February 24, 2009, outside United States territorial waters. The affidavit also states that after making visual contact with the Black Sea as it entered the Palmas del Mar Marina in Humacao, the vessel was detained at a pier within the Marina at approximately 2:00 a.m. on February 25, 2009.  (Docket No. 52-2, at 4, ¶ 7.)  Second, according to the affidavit after the vessel was detained by CBP agents at a dock in Palmas del Mar Marina, the defendants  gave conflicting statements as to their point of origin.  Third, the affidavit also states that because of these discrepancies, the CBP officers opted to conduct a sweep of the boat with a K-9.  Upon inspecting the vessel, the K-9 gave a positive hit of narcotics present in the vessel.  Also, the affidavit stated that several packages of Ziploc brand bags, vacuum sealer bags, and several bottles of odor wipes were aboard the vessel.  These items according to the affiant were consistent with recent seizures made on pleasure vessels used to smuggle narcotics.  Thus, this statements which were made by the affiant when considered together are

CRIMINAL 09-0096 (DRD)                30

sufficient by themselves to provide probable cause for a search warrant.  As such the warrant was properly issued.

### E.  The Leon Good Faith Exception

Rodríguez-Sorrienti also contends that the León exception to suppression of the seized evidence is inapplicable for two reasons:  (1) the warrant is based upon an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable[,]" United States v. León, 468 U.S. at 923 (quoting Brown v. Illlinois, 422 U.S. 590, 610-11 (1975)), (2) the affidavit that was relied on to issue the search warrant was deliberately and/or recklessly false. United States v. León, 468 U.S. at 914 n.12.  However, I find that even if it were true that the search warrant was issued without the requisite showing of probable cause, the evidence that was seized is not to be excluded from trial under the León good faith exception.

"In [United States v.] León the Supreme Court held that a search warrant had been issued without a sufficient showing of probable cause." United States v. Hernández, 183 F. Supp. 2d 468, 478 (D.P.R. 2002) (citing United States v. León, 468 U.S. at 906).  Nevertheless, "the Court refused to exclude the fruits of the search based on that fact." Id.  Also, "[t]he opinion explained that the exclusionary rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal

CRIMINAL 09-0096 (DRD)                    31

constitutional right of the party aggrieved." Id.  "Whether the exclusionary sanction is appropriately imposed in a particular case, our decisions make clear, is 'an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct.'"  Id. (quoting  United States v. León, 468 U.S. at  906) (quoting Illinois v. Gates, 462 U.S. at 223).  "The Court in Leon concluded, then, that suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purpose of deterring police misconduct." United States v. Hernández, 183 F. Supp. 2d at 478 (quoting United States v. León 468 U.S. at 918).  "Hence, when an officer relies in good faith on the magistrate's issuance of a warrant, and conducts a search which he believes is legal, the evidence will not be excluded, since no deterrent purpose can be furthered.  This is what is known as the good faith exception." United States v. Hernández, 183 F. Supp. 2d at 478.

     "Under Leon, the 'government bears the burden of showing that its officers acted with good faith.'"  Id. at 478-79 (quoting United States v. Brunette, 256 F.3d 14, 17 (1st Cir. 2001)).  "To make this assessment, we evaluate all of the attendant circumstances at the time of the warrant application and its execution." Id. Therefore, "objective good faith reliance turns on the totality of the circumstances, but in León, the Supreme Court indicated four situations in which

CRIMINAL 09-0096 (DRD)                    32

reliance on the police would not be reasonable." United States v. Hernández, 183

F. Supp. 2d at 478-79 (citing United States v. León, 438 U.S. at 922-23).  "In all

of them, good faith is absent:  1) the information provided by the officer in the

affidavit is deliberately misleading or provided with reckless disregard; 2) the

issuing magistrate ceased to play a neutral role; 3) the affidavit is so lacking in

indicia of probable cause that the officer's belief is entirely unreasonable; 4) the

warrant is so defective that the officer who executed it could not presume it was

valid."  Id.  The defendant does not claim that the magistrate judge was in any

way prejudiced or that the warrant was defective in any way.  Nevertheless, the

defendant believes that of the four situations mentioned here, which might

preclude the application of the good faith exception, the first and the third

situation are present in this case.  They are not.  The United States addresses in

its motion the first of these four situations.  According to the United States, the

court was not intentionally misled in any detail in the affidavit, since the

statements made by the affiant were based on the information that was provided

to him by other agents.  The government states that the affiant was told that:  (1)

the vessel was observed in international waters, and (2) of  the findings of the

search conducted by the CBP search team of the tanks and paint.  Also, the

government holds that the affiant did not make any comment stating that no

alterations were made on the vessel's fuel tank nor that they appeared to be

CRIMINAL 09-0096 (DRD)                    33

painted.  As such, the statements that the defendant focuses on fail to establish

that they were included knowingly and intentionally or with reckless disregard for

the truth by the affiant.  Also I disagree with the defendant's assertion that the

warrant is based upon an affidavit so lacking in indicia of probable cause as to

render official belief in its existence entirely unreasonable.  The defendant relies

heavily on the fact that the affidavit makes continuous reference to a source of

information whose reliability and credibility was neither supported nor referred to

in the affidavit.  Regardless, it has already been established that this did not mean

that the affidavit failed to establish probable cause to search the vessel for

evidence of contraband, since the finding of probable cause does not rely solely

on the information provided by the source of information, and that the statements

made  by the affiant regarding the conflicting testimonies given by the defendants

as to  where they were coming from, which lead CBP officers to believe that they

where in international waters,  the K-9's positive indication of narcotics present

in the vessel as well as that several packages of Ziploc brand bags, vacuum sealer

bags, and several bottles of odor wipes that were later found aboard the vessel

provided more than probable cause for issuing the search warrant.  Accordingly,

I find that based on the totality of the circumstances the officers in this case acted

with a good faith reasonable belief that the warrant was not defective.  Both

CRIMINAL 09-0096 (DRD)                34

defendants' motions lack merit.   Therefore, the evidence seized and the statements given cannot be suppressed.

### III.  CONCLUSION

For the reasons set forth, I recommend that defendants Walter Andujar-Aponte and Anthony Rodríguez-Sorrienti's motions to suppress evidence be DENIED.

Under the provisions of Rule 72(d), Local Rules, District of Puerto Rico, any party who objects to this report and recommendation must file a written objection thereto with the Clerk of this Court within ten (10) days of the party's receipt of this report and recommendation.  The written objections must specifically identify the portion of the recommendation, or report to which objection is made and the basis for such objections.  Failure to comply with this rule precludes further appellate review.   See Thomas v. Arn, 474 U.S. 140, 155 (1985); Davet v. Maccorone, 973 F.2d 22, 30-31 (1st Cir. 1992); Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985 (1st Cir. 1988); Borden v. Sec'y of Health & Human Servs., 836 F.2d 4, 6 (1st Cir. 1987); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir. 1980).

At San Juan, Puerto Rico, this 10th day of November, 2009.

S/ JUSTO ARENAS
Chief United States Magistrate Judge