UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Civil No. 09-096 (DRD) |
| WALTER ANDUJAR-APONTE [1],
MOISES CARDONA-PEREZ [2],
GABRIEL FRANKI-IRIZARRY [3],
ANTHONY RODRIGUEZ SORRIENTI [4], | |
| Defendants. | |

**OMNIBUS ORDER ADOPTING REPORTS AND RECOMMENDATIONS
(DOCKET ENTRIES NO. 105 AND 141)**

Pending before the Court are several motions filed by three of the defendants herein.  For easy reference, the Court has organized the motions by defendant *albeit* not necessarily in chronological or numerical docket number:

1.    Defendant Walter Andújar-Aponte [1] (hereinafter "Andújar"):

    (a)  *Second Motion To Suppress Physical Evidence And Statements* (Docket No. 76).
    (b)  *Objections To Report And Recommendation* (Docket No. 148).

2.    Defendant Moisés Cardona-Pérez [2] (hereinafter "Cardona"):

    (a) *Motion Adopting And Joining Codefendant Franki-Irizarry's Objections To Magistrate Judge Report And Recommnedation (Docket No. 111)* (Docket No. 126).

3.    Defendant Gabriel Franki-Irizarry [3] (hereinafter "Franki"):

    (a) *Motion To Dismiss And/Or Suppress Evidence* (Docket No. 52).
    (b) *Motion Requesting Order For The Government To Produce Discovery Material* (Docket No. 74).
    (c) *Objections To Magistrate Judge Report And Recommendation* (Docket No. 111).

4.    Defendant Anthony Rodríguez-Sorrentini [4] (hereinafter "Rodríguez"):

    (a) *Motion To Suppress Evidence Under Franks v. Delaware* (Docket No. 70).
    (b) *Motion Joining Co-Defendant Walter Andújar-Aponte Objections To Report And Recommendation, Docket No. 148* (Docket No. 151).
    (c) *Objections To Magistrate Judge's Report And Recommendation* (Docket No. 152).

The Government has filed the following motions in response to the defendants' motions:

(a) *United States' Response To Defendants' Motions To Dismiss And Suppress* (Docket No. 86).

(b) *United States Opposition To Defendants [1] Walter Andújar-Aponte And [4] Anthony Rodríguez-Sorrentini's Objections To Magistrate Judge's Report and Recommendation (Docket No. 141) And Defendant [3] Gabriel Franki-Irizarry's Objections To Magistrate Judge's Report And Recommendation (Docket No. 105)* (Docket No. 160).

The Court referred the following motions to the Chief Magistrate Judge Arenas ("Magistrate Judge Arenas") for report and recommendation: (a) *Motion To Dismiss And/Or Suppress Evidence* filed by Franki (Docket No. 52); (b) *Motion To Suppress Evidence Under Franks v. Delaware* filed by Rodríguez (Docket No. 70); (c) *Motion Requesting Order For The Government To Produce Discovery Material* filed by Franki (Docket No. 74); (d) *Second Motion To Suppress Physical Evidence And Statements* filed by Andújar (Docket No. 76); and (e) *United States' Response To Defendants' Motions To Dismiss And Suppress* (Docket No. 86). Magistrate Judge Arenas entered two reports, to wit: (a) *Magistrate Judge's Report and Recommendation* (hereinafter "*Report and Recommendation I*") (Docket No. 105), which entertained Franki's motion to dismiss (Docket No. 52); and (b) *Magistrate Judge's Report and Recommendation* (hereinafter "*Report and Recommendation II*") (Docket No. 141), which entertained Andújar's second motion to suppress (Docket No. 76). Defendants objected to the findings and recommendations made by Magistrate Judge Arenas. *See* (Docket entries No. 111, 148, 151, 152). The Government opposed the defendants' objections to the *Reports and Recommendations I and II*.

The record shows that Magistrate Judge Arenas granted Andújar, Franki, and Rodríguez (10) days to object to both *Reports and Recommendations I and II.* *See* Docket entries No. 105 at page 24, and 141 at page 34. The last day to object to both *Reports and Recommendations I and II*, as extended by *Order* of the Court was December 1, 2009 (Docket No. 150). The Government was granted thirty (30) days, thereafter, to reply (Docket No. 154). The record further shows that Franki, Cardona, Andújar and Rodríguez timely objected to the *Reports and Recommendations I and II.* *See* Docket entries No. 111, 126, 148, 151

and 152.  The Government filed its opposition to defendants' objections on January 7, 2010.  *See* Docket No. 160.

The Court finds that the Magistrate Judge appropriately forewarned the defendant of the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 72(d) of the Federal Rule of Civil Procedure ("Fed.R.Civ.P."), that any written objections to the *Report and Recommendation* must be filed with the Clerk of Court within the next ten (10) days upon receipt of the *Report and Recommendation*.  Furthermore, the defendant was duly advised that failure to comply with the provisions of Rule 72(d) of the Fed.R.Civ.P. is a "waiver of the right to review by the district court.  *United States v. Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986)."  *See* Docket entries No. 105 and 141.  Furthermore, it is settled that defendant's failure to timely object to the report and recommendation precluded any further appellate review.  *See Thomas v. Arn*, 474 U.S. 140, 155 (1985).  *See also* Rule 72(d) of the Local Civil Rules of the United States District Court for the District of Puerto Rico. Hence, according to the *Reports and Recommendations* (Docket entries No. 105 and 141), the parties had ten (10) days to file the objections to the reports.

In the instant case, the objections to the *Reports and Recommendations* were timely filed, hence, we must examine the matter *de novo*, *see* discussion *infra*.  For the reasons set forth below, the Court adopts *in toto* both the *Reports and Recommendations I and II* (Docket entries No. 105 and 141), as supplemented herein.

## Standard of Review for a Report and Recommendation

A District Court may refer dispositive motions to a United States Magistrate Judge for a Report and Recommendation. 28 U.S.C. § 636(b)(1)(B) (1993); Rule 72(b) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."); Rule 72 of the Local Rules for the District of Puerto Rico ("Local Rules").  *See Mathews v. Weber*, 423 U.S. 261 (1976).  As a general rule, an adversely affected party may contest the Magistrate Judge's report and recommendation by filing its objections within ten (10) days after being served a copy thereof. *See* Local Rule 72; Fed.R.Civ.P. 72(b). Moreover, 28 U.S.C. § 636(b)(1), in its pertinent part,

provides that:

> Within ten days[1] of being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate.

However, "[a]bsent objection by the plaintiffs, [a] district court ha[s] a right to assume that [a party] agree[s] to the magistrate's recommendation." *Templeman v. Chris Craft Corp.*, 770 F.2d 245, 247 (1st Cir. 1985), *cert. denied*, 474 U.S. 1021 (1985). Moreover, "[f]ailure to raise objections to the Report and Recommendation waives that party's right to review in the district court and those claims not preserved by such objection are precluded on appeal." *Davet v. Maccarone*, 973 F.2d 22, 30-31 (1st Cir. 1992). *See also Henley Drilling Co. v. McGee*, 36 F.3d 143, 150-151 (1st Cir. 1994) (holding that specific objections are required when challenging findings actually set out in magistrate's recommendation, as well as magistrate's failure to make additional findings); *Lewry v. Town of Standish*, 984 F.2d 25, 27 (1st Cir. 1993) (stating that "[o]bjection to a magistrate's report preserves only those objections that are specified"); *Keating v. Secretary of H.H.S.*, 848 F.2d 271, 275 (1st Cir. 1988); *Borden v. Secretary of H.H.S.*, 836 F.2d 4, 6 (1st Cir. 1987) (holding that appellant was entitled to a *de novo* review, "however he was not entitled to a *de novo* review of an argument never raised"). *See generally United States v. Valencia-Copete*, 792 F.2d 4, 6 (1st Cir. 1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 605 (1st Cir. 1980). **Hence, the standard for review of an objected report and recommendation is *de novo* review of those matters properly objected**. *See Borden v. Secretary of H.H.S.*, 836 F.2d at 6.

In the instant case, defendants Franki, Cardona, Andújar and Rodríguez timely objected to the

---

[1] The Court is mindful that effective December 1, 2009, the ten day period to object to a report and recommendation has been amended to fourteen days. The new amendment, however, is not applicable to the instant case, as the *Report and Recommendation I* (Docket No. 105) was issued on August 21, 2009, and the *Report and Recommendation II* (Docket No. 141) was issued on November 10, 2009.

findings and recommendations made by Magistrate Judge Arenas, hence, the Court must review *de novo* each report and recommendation as to those specific portions objected to. *See Douglass v United Servs. Auto, Ass'n*, 79 F.3d 1415 (5th Cir. 1996); *Nogueras-Cartagena v. United States*, 172 F. Supp. 2d 296, 305 (D.P.R. 2001); *Garcia v. I.N.S.*, 733 F. Supp. 1554 (M.D.Pa. 1990).

The Court notes that, as of this date, defendant Cardona [2] has not filed a dispositive motion or has joined the other defendants' motions to dismiss and/or suppress evidence.

## Analysis

On March 11, 2009, all the defendants were indicted on seven counts, to wit: (a) Count One involving charges for possession with the intent to distribute controlled substances under 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(ii) and 18 U.S.C. § 2; (b) Count Two involving a conspiracy to possess with intent to distribute controlled substances under 21 U.S.C. §§ 846 and 841(a)(1), and 841(b)(1)(A)(ii); (c) Count Three involving importation of a controlled substance under 21 U.S.C. §§ 952(a) and 960(a)(1) and (b)(1)(B); 18 U.S.C. § 2; (d) Count Four involving a conspiracy to import a controlled substance under 21 U.S.C. §§ 963 and 952(a) and 960(a)(1) and (b)(1)(B); (e) Count Five involving possession of a controlled substance on board a vessel subject to the jurisdiction of the United States, aiding and abetting under 46 U.S.C. §§ 70502(c)(1)(D), 70503(a)(1), 70504(b)(1); 18 U.S.C. § 2; (f) Count Six involving a conspiracy to possess a controlled substance on board a vessel subject to the jurisdiction of the United States under 46 U.S.C. §§ 70502(c)(1)(D), 70503(a)(1), 70504(b)(1) and 70506(b); and, (g) Count Seven involving a drug forfeiture allegation (Count Seven) under 21 U.S.C. §§ 853 and 881; 46 U.S.C. § 70507.

A.     **Findings of Fact for both *Reports and Recommendations I and II* (Docket entries No. 105, 141):**

As to the summary of facts, the Court adopts *in toto* the findings of fact made by the Magistrate Judge, which are the same for both *Reports and Recommendations I and II* (Docket entries No. 105 and 141):

> The following facts are derived from the complaint and accompanying affidavit signed by Immigration and Customs Enforcement ("ICE") Special

Agent Francisco J. Gregory (the "complaint affidavit"), (Docket Nos. 3 & 3-2), the affidavit submitted by Special Agent Gregory pursuant to an Application for a Search Warrant, (Docket No. 52-2), the defendants' motions, (Docket Nos. 70 & 76), and the government's response. (Docket No. 86.)

In January 2009, Drug Enforcement Administration ("DEA") agents assigned to the Carribean Corridor Strike Force ("CCSF") learned from a source of information ("SOI") that a sea vessel named the Black Sea would be utilized at some point to smuggle narcotics into Puerto Rico. (Docket No. 52-2, at 3, ¶ 4.) The Black Sea is a Viking brand 54 foot yacht owned by MDS Caribbean Seas, Ltd. and registered in the British Virgin Islands. Around 10:30 p.m. on February 24, 2009, Customs and Border Protection ("CBP") Air Interdiction Agents observed a sea vessel heading east of the south coast of Puerto Rico, "outside U.S. territorial waters." (Id. at 4, ¶ 7.) The parties agreed that the boat was traveling through rough seas, and according to the government, "the vessel was traveling at high speeds." (Docket No. 86, at 2, ¶ 3.) A CBP Marine Unit was directed towards the vicinity of the vessel, and it ultimately made visual contact with the Black Sea as it entered the Palmas del Mar Marina in Humacao, Puerto Rico.

CBP Marine Interdiction Agents ("MIA") stopped the Black Sea at a pier within the Marina at approximately 2:00 a.m. on February 25, 2009. (Docket No. 52-2, at 4, ¶ 7.) The agents identified and interviewed four men on board, defendants Walter Andújar-Aponte, Moisés Cardona-Pérez, Antonio Rodríguez-Sorrienti, and Gabriel Franki-Irizarry. There is no indication that any of the four men were placed under arrest at this time, nor is there any indication that they were read their rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). Andujar-Aponte identified himself as the vessel's captain. (Id.) According to both the complaint affidavit and the warrant affidavit, Andujar-Aponte stated that the men had been fishing approximately twenty-five miles off the coast of Puerto Rico. (Docket No. 3-2, at 1, ¶ 5; Docket No. 52-2, at 4, ¶ 7.) This is consistent with the warrant affidavit's averment that the vessel was initially observed "outside U.S. territorial waters." (Docket No. 52-2, at 4, ¶ 7.)

One crew member said that the vessel had departed from La Parguera, Puerto Rico, while another said it had departed from Ponce, Puerto Rico. According to the government, Andujar-Aponte initially stated the crew had come from La Parguera, but later stated they originated in Cabo Rojo, Puerto Rico. (Docket No. 86, at 2, ¶ 4.) In light of these discrepancies, the CBP officers opted to conduct a sweep of the boat with a K-9 named Hugo. (Docket No. 3-2, at 2, ¶ 5; Docket No. 52, at 6, ¶ 1.) According to the U.S. CBP division of the Department of Homeland Security, Hugo is "reliable in the detection of substances" including cocaine. (Docket No. 86-3.) The CBP division states that "[i]t is recommended that [teams including Hugo] be routinely used in all work environments." (Id.) Upon inspecting the

6

vessel, Hugo "had a positive hit in the master bedroom deck." (Docket No. 3-2, at 2, ¶ 5; Docket No. 52, at 6, ¶ 1.) The CBP Contraband Enforcement Team thus proceeded to conduct a search of the vessel, but had found no contraband by the time the agents concluded the search in the morning hours of February 25, 2009. The government states that the crew members were free to leave at this point, and defendants do not contend otherwise. (Docket No. 86, at 3, ¶ 4.)

On February 26, 2009, a group of agents from ICE, CCSF, and CBP returned to the Black Sea. The government contends that only two of the four defendants were present at that time: Andujar-Aponte and Cardona-Pérez. (Docket No. 86, at 3-4; Docket No. 3-2, at 2, ¶ 6.) The government states that Franki-Irizarry was "not present when [the] agents returned on February 26, 2009 or in the next several days as the search continued." (Docket No. 86, at 9, ¶ 3.) Defendant does not contend otherwise. In all events, CBP officers informed the crew that the proper border entry requirements had not been completed for the vessel, and the agents proceeded to begin searching the boat again. In the master bedroom of the cabin, agents found ten brand new black duffle bags, several packages of Ziploc brand bags, one package of vacuum sealer bags, and several plastic bottles of odor wipes. (Docket No. 52-2, at 4, ¶ 8.) The affidavit states that these items were "consistent with recent seizures made on pleasure vessels used to smuggle narcotics." (Id. at 4-5, ¶ 8.) No narcotics were found on this day, however, and the search concluded at 8:00 p.m.

The following day, February 27, 2009, MIA and CBP officers contacted Andujar-Aponte and requested that he and his crew be present at the vessel for another inspection. Andujar-Aponte stated that he would not return to the vessel. (Docket No. 3-2, at 2, ¶ 7.) The government contends that none of the four defendants ever returned to the vessel and neither the complaint affidavit, the warrant affidavit, nor defendant's brief states otherwise. (Docket No. 86, at 4.) MIA officers transported the vessel to Marina Puerto del Rey Marina and placed it in dry dock. The agents received further information corroborating their initial SOI that narcotics were aboard the vessel, but concluded the investigation on that day without finding any contraband.

Another more invasive search took place on February 28, 2009. According to the defendant, customs agents "destroyed the ceilings, the bathrooms, the doors, drilled holes in the fuel tank, drilled holes in other tanks, cut holes in the walls, broke the beds, broke the seats, removed the doors, many systems made unusable [sic], etc." (Docket No. 52, at 2.) The search was unavailing. No search took place on Sunday, March 1, 2009, and the agents were nearing conclusion of their search on March 2 when they received further information indicating that narcotics were aboard the vessel. Based on the facts and information obtained to that point, CCSF Agents applied

for a search warrant to perform a more invasive search of the vessel. (Docket No. 52-2.) The warrant was signed on March 3, 2009. On March 4, CCSF agents and CBP officers resumed the search and found a total of two hundred eighty-eight kilograms of cocaine packed behind shower stall fixtures in the two bathrooms within the vessel. (Docket No. 3-2, at 2, ¶ 10; Docket No. 86, at 5-6; Docket No. 86-4.)

On March 5, 2009, CCSF agents obtained a criminal complaint against and warrants for the arrest of the defendants. At approximately 6:00 p.m. that day, defendant Franki-Irizarry self-surrendered to federal agents in Joyuda, Puerto Rico. (Docket No. 86, at 6.) He was immediately transferred to the CBP facility in Aguadilla, Puerto Rico, where he was informed of his rights and signed a form waiving those rights. He stated that he was responsible for cleaning the Black Sea and had never been outside of Puerto Rico aboard the vessel. The government contends, however, that according to CCSF agent investigation, the Black Sea arrived in La Romana, Dominican Republic, on February 14, 2009, and that Franki-Irizarry had been on board the vessel at that time. (Docket No. 86, at 6.) According to the government, he was also on board the vessel when it departed from the Dominican Republic. The government states that a GPS device aboard the Black Sea demonstrates that a trip to the Dominican Republic in February 2009 had been planned for the vessel. (Docket No. 86, at 7.) According to information evidently available on the device, the vessel was headed to that country, but the device was turned off on February 14, 2009. In any event, Mr. Franki-Irizary was arrested on March 5, 2009 and appeared before a magistrate judge on the afternoon of March 6, 2009.

B.   **Legal Analysis for *Report and Recommendation I* (Docket No. 105):**

The Court adopts *in toto* the legal analysis made by Magistrate Judge Arenas (Docket No. 105, pages 8-24. Hence, the Court will only address the objections raised by defendant Franki (Docket No. 111), which Cardona joined (Docket No. 126). Hence, any ruling as to defendant Franki will also be applicable to defendant Cardona, as he joined Franki's objections.

Defendant alleges that:

(1) The Magistrate Judge failed to address "the necessity of a hearing regarding the suppression of the search and seizure before the [search] warrant was obtained." *See* Docket No. 111, page 8. The Court disagrees with defendant Franki's objection, as the Magistrate Judge specifically addressed this issue in the *Report and Recommendation* (Docket No. 105, pages 17-19). For easy reference, the analysis of the

8

Magistrate Judge is incorporated herein:

> Defendant next contends that the search warrant was invalid because a variety of statements within the warrant affidavit are allegedly unsupported or false. (Docket Nos. 52, at 21, 52-2). Defendant therefore requests a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). (Docket No. 52, at 22-23.) "A defendant is entitled to an evidentiary hearing under *Franks v. Delaware* where the defendant 'makes a substantial preliminary showing' that both (1) 'a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit' and (2) 'the allegedly false statement is necessary to the finding of probable cause.'" *United States v. Reiner*, 500 F.3d 10, 14 (1st Cir. 2007), cert. denied, 128 S. Ct. 1737 (2008) (quoting *Franks v. Delaware*, 438 U.S. at 155-56). Both elements are essential to establish the necessity of a Franks hearing.

> Here, there is no need for such a hearing, as defendant cannot establish the second element. There were at least two sound bases for finding probable cause to justify the search warrant, and defendant does not challenge the veracity or reliability of either. First, the K-9 Hugo gave a positive indication of the presence of narcotics aboard the vessel. According to the Department of Homeland Security, the K-9 was "reliable in the detection of [cocaine] . . . . " (Docket No. 86-3.) A "positive alert from a canine sniff may be used as probable cause to obtain a warrant . . . . " *United States v. Carreras*, 851 F. Supp. 502, 505 (D.P.R. 1994) (citing *United States v. Sokolow*, 490 U.S. 1 (1989)) ("probable Cause [sic] to arrest individuals suspected of transporting illegal drugs in an airport may be proven with 'evidence of a strong alert by a narcotics dog [to the odor of drugs in a specific container], evidence that the dog was reliable and evidence linking the container to the individual arrested.'") (quoting *United States v. Colón*, 845 F. Supp. 923, 928 (D.P.R. 1994)). As such, the evidence from the K-9 alone was sufficient to justify the search warrant and no other statement in the affidavit was necessary to the finding of probable cause. Defendant fails to contest the reliability or veracity of the dog's alert, and therefore fails to identify a false statement within the affidavit necessary to the finding of probable cause.

> A second legitimate basis for issuance of the warrant was the affidavit's reference to the ten brand new black duffle bags, several packages of Ziploc brand bags, one package of vacuum sealer bags, and several plastic bottles of odor wipes. (Docket No. 52-2, at 4, ¶ 8.) "[T]he presence on the same premises of an unusually large number of zip lock plastic bags . . . combined with [an agent's] extensive experience as a law enforcement officer [may] plainly buttress[ ] the informant-based indicia of probable cause." *United States v. Taylor*, 985 F.2d 3, 6 (1st Cir. 1993). Here, the presence of several packages of Ziploc brand bags, vacuum sealer bags, and several bottles of odor wipes is certainly unusual and appears inconsistent

with defendants' ostensible reason for the sea voyage:  a fishing excursion. The items are "consistent with recent seizures made on pleasure vessels used to smuggle narcotics," according to the warrant affidavit by ICE Special Agent Gregory.  (Docket No. 52-2, at 4-5, ¶ 8.)  Special Agent Gregory has been a Special Agent with ICE for seven years, and "the issuing magistrate properly may credit the experience and pertinent expertise of a law enforcement affiant in evaluating the authenticity of the informant's description of the target's modus operandi."  *United States v. Taylor*, 985 F.2d at 6 (finding warrant affidavit sufficiently supported probable cause to search defendant's premises).  Much like the affidavit's averments as to the K-9, the allegation that various bags and deodorizing items were aboard the Black Sea was sufficient in itself to provide probable cause for a search warrant.  Defendant does not contest the veracity or reliability of that allegation, and he is therefore not entitled to a Franks v. Delaware hearing.

The standard for probable cause to issue a search warrant is not burdensome, it merely "requires a probability, not a prima facie showing, of criminal activity."  *See United States v. Syphers* 426 F.3d 461, 464-465 (1st Cir. 2005).  In *Syphers*, the Court held:

> Probable cause for a warrant based on an affidavit "exists where information in the affidavit reveals a 'fair probability that contraband or evidence of a crime will be found in a particular place.'  'Probability is the touchstone' of this inquiry."  *United States v. Badyga*, 233 F.3d 674, 683 (1st Cir. 2000) (quoting *United States v. Khounsavanh*, 113 F.3d 279, 283 (1st Cir. 1997).  Thus, the standard of probable cause **requires probability, not a prima facie showing, of criminal activity**."  *United States v. Burke*, 999 F.2d 596, 599 (1st Cir. 1993); *see also United States v. DeQuasie*, 373 F.3d 509, 518 (4th Cir. 2004) ("The **probable cause standard does not require officials to possess an airtight case before taking action**." (internal quotations and citation omitted)).
>
> . . .
>
> **The standard applied in determining the sufficiency of an affidavit is a 'totality of the circumstances' test**.  *United States v. García*, 983 F.2d 1160, 1167 (1st Cir. 1993) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  (Emphasis supplied).

Hence, the Court will not overturn the issuance of a search warrant for failure to comply with the probable cause standard, that is, "fair probability that contraband or evidence of a crime will be found in a particular place," *Badyga*, *supra*, as the Court finds that there was probable cause to issue the search

warrant.

The Court finds that the standard for suppression of the evidence seized is also one of probable cause. After a careful review of the affidavit submitted by Special Agent Gregory pursuant to an Application for a Search Warrant (Docket No. 52), the Court finds that the sworn statement fully complies with the standard of probable cause set forth as to the issuance of a search warrant to search the vessel Black Sea. *See United States v. Syphers*, 426 F.3d at 464-465. Hence, defendant Franki's objection is denied.

(2) The Magistrate Judge concluded that defendant Franki "is not entitled to a hearing because he cannot establish the second element established in *Franks v. Delaware*, 438 U.S. 154 (1978)." *See* Docket No. 111, page 8). Defendant's objection is denied on the same grounds discussed by the Court under objection number 1. *See infra*, pages 8-11. "The standard of probable cause requires probability not a prima facie showing, of criminal activity." *Syphers*, 426 F.3d at 464-465. "The probable cause standard does not require officials to possess an air tight case before taking action." *Id.*

(3) The Magistrate Judge erred when he concluded that defendant Franki "had standing to contest the search, since [sic] he abandoned the vessel he no longer has standing to his Fourth Amendment claim." *See* Docket No. 111, page 8. For easy reference, the analysis of the Magistrate Judge (Docket No. 105, pages 8-12), is incorporated herein:

> The Fourth Amendment of the United States Constitution provides that:
>
> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
>
> U.S. Const. amend. IV. "It is 'well settled that a defendant who fails to demonstrate a legitimate expectation of privacy in the area searched or the item seized will not have 'standing' to claim that an illegal search or seizure occurred.'" *United States v. Vilches-Navarrete*, 523 F.3d 1, 13 (1st Cir.), cert. denied, 129 S. Ct. 208 (2008) (citing *United States v. Mancini*, 8 F.3d 104, 107 (1st Cir. 1993)). In order to make such a demonstration, a

defendant bears the burden of showing that "he had both a subjective expectation of privacy and that society accepts that expectation as objectively reasonable." *United States v. Vilches-Navarrete*, 523 F.3d at 13 (citing *California v. Greenwood*, 486 U.S. 35, 39 (1988)); cf. *United States v. Scott*, 975 F.2d 927, 928 (1st Cir. 1992); *see United States v. Sánchez*, 943 F.2d 110, 113 (1st Cir. 1991).

Generally speaking, "a crew member cannot have an expectation of privacy in a space that the Coast Guard is free to inspect in the course of a document and safety check." *United States v. Cardona-Sandoval*, 6 F.3d 15, 22 (1st Cir. 1993). However, "cases involving substantial vessels, such as cargo ships and freighters, must be distinguished from . . . small pleasure craft used for fishing." Id. (finding that a four person crew "possessed a reasonable expectation of privacy in all areas of the vessel," a forty-three foot fishing boat). This is because "[i]n such a [small] vessel there are no 'common areas' in the same sense that the cargo hold or dining room on a large boat are public or common. The fact that several individuals may share the limited space no more makes the space public than would the fact that a family may share a house or a hotel room." *Id*.

Much like the boat in *Cardona-Sandoval*, the Black Sea was a pleasure craft, evidently equipped for fishing, with four individuals on board. It was only eleven feet longer than the vessel in *Cardona-Sandoval*. In light of these striking similarities, *Cardona-Sandoval* is controlling. As a crew member of a smaller pleasure craft, Franki-Irizarry had an expectation of privacy aboard the Black Sea, and therefore had standing to raise a challenge under his Fourth Amendment rights for as long as he remained with the boat.

Franki-Irizarry did not, however, retain that standing throughout the multi-day search of the boat. "[T]he act of abandonment extinguishe[s] [a defendant's] Fourth Amendment claim." *United States v. Sealey*, 30 F.3d 7, 10 (1st Cir. 1994) (no expectation of privacy in firearm, magazine and ammunition that defendant discarded as he fled police); *see Abel v. United States*, 362 U.S. 217, 241 (1960). "[W]hen an individual abandons property, he forfeits any reasonable expectation of privacy in it, and consequently police may search it without a warrant." *United States v. Sealey*, 30 F.3d at 10 (citing *United States v. Lewis*, 921 F.2d 1294, 1302 (D.C. Cir. 1990)). Put another way, "[i]t is well established that one who abandons or disclaims ownership of an item forfeits any claim of privacy in its contents, and that as to that person the police may search the item without a warrant." *United States v. de Los Santos Ferrer*, 999 F.2d 7, 9 (1st Cir. 1993) (disclaimer of ownership of a suitcase at an airport constituted abandonment and forfeiture of claim of privacy in its contents); *see also United States v. Scott*, 975 F.2d at 929 ("[A] person who places trash at a curb to be disposed of or destroyed by a third person abandons it because 'implicit in the concept of abandonment is a renunciation of any

12

reasonable expectation of privacy in the property abandoned.'") (quoting *United States v. Mustone*, 469 F.2d 970, 972 (1st Cir. 1972) (footnote omitted)); cf. *United States v. Moss*, 887 F.2d 333, 334 (1st Cir. 1989) (giving consideration to narcotics found on a boat for purposes of pretrial sentencing, where narcotics were found after defendant had abandoned ship and attempted to swim ashore).

Here, it is uncontested that Franki-Irizarry did not return to the boat after the initial search of the vessel on February 25, 2009. We "consider ownership, possession, control, ability to exclude from the premises, or a legitimate presence on the premises when determining the existence of a legitimate expectation of privacy." *United States v. Cardona-Sandoval*, 6 F.3d at 21 (citing *United States v. Melucci*, 888 F.2d 200, 202 (1st Cir. 1989); *United States v. Aguirre*, 839 F.2d 854, 856 (1st Cir. 1988)). As the crew member hired to clean the vessel, the defendant has demonstrated no ownership or ability to control the Black Sea. Further, by voluntarily leaving the vessel behind, Franki-Irizarry ceded any possession, ability to exclude from the premises, or legitimate presence on the premises he might otherwise have had. Defendant cites *Chapman v. United States*, 365 U.S. 610 (1961) to support the argument that his presence was not necessary to retain a possessory interest in the vessel, and that he therefore maintained a privacy interest in it even after leaving it. (Docket No. 52, at 19.) *Chapman* is inapposite, however, as it involved a tenant's possessory interest in his own apartment dwelling, something far more sacred than the interest of a low level crew member in a sea vessel owned by another. *Chapman v. United States*, 365 U.S. at 615 ("The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance."). While *Chapman* held that "one's house cannot lawfully be searched without a search warrant, except as an incident to a lawful arrest therein," *Chapman v. United States*, 365 U.S. at 613 (quoting *Agnello v. United States*, 269 U.S. 20, 32 (1925)), there is no such precept with respect to sea vessels. *See United States v. Victoria-Peguero*, 920 F.2d 77, 80 (1st Cir. 1990) (approving of warrantless search aboard a sea vessel). Thus, defendant's situation is better analogized to *United States v. Sealey*, 30 F.3d 7 (1st Cir. 1994); *United States v. de Los Santos Ferrer*, 999 F.2d 7 (1st Cir. 1993); and *United States v. Scott*, 975 F.2d 927 (1st Cir. 1992). Defendant abandoned the Black Sea and therefore lacked any privacy interest in it from that point forward. Accordingly, he has no standing as to any Fourth Amendment claims arising subsequent to the initial search of the boat in the early morning hours of February 25, 2009.

The Court further adopts the analysis made by the Magistrate Judge as to warrantless search and border search. *See* Docket No. 105, pages 12-17. For easy reference, said analysis is incorporated herein:

Defendant contends United States Customs had no authority to inspect the

13

Black Sea without a warrant.  He argues that the CBP had no right to search the vessel under the "border search" exception to the Fourth Amendment. Defendant's argument merits consideration only until the time he abandoned the vessel.  "The border search exception provides that routine searches of persons and effects at borders are permitted without the requirement of probable cause."  *United States v. Momoh*, 427 F.3d 137, 143 (1st Cir. 2005) (citing *United States v. Ramsey*, 431 U.S. 606, 619 (1977)).  "Since the founding of our Republic, Congress has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country."  *United States v. Montoya de Hernández*, 473 U.S. 531, 537 (1985) (citing *United States v. Ramsey*, 431 U.S. at 616-17 (citing Act of July 31, 1789, ch. 5, 1 Stat. 29)).  Statutory authority for the border search exception comes from Section 1581 of *United States Code* Title 19:

> Any officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States or within the customs waters . . . and examine, inspect, and search the vessel or vehicle and every part thereof and any person, trunk, package, or cargo on board, and to this end may hail and stop such vessel or vehicle, and use all necessary force to compel compliance.

19 U.S.C. § 1581(a); *United States v. Zurosky*, 614 F.2d 779, 787 n.7 (1st Cir. 1979); *United States v. Victoria-Peguero*, 920 F.2d at 80.

Under the exception, officials may conduct an extended, warrantless border search if "officials have reasonable certainty or a high degree of probability that a border was crossed," *United States v. Pérez-Rivera*, 247 F. Supp. 2d 108, 115 (D.P.R. 2003), and if the search satisfies "the constitutional requirement of reasonableness."  *United States v. Victoria-Peguero*, 920 F.2d at 80.

The first issue is whether the agents in this case had "reasonable certainty" or "a high degree of probability" that a border was crossed.  "The sea boundary  of the United States territory is a marine league (three geographic miles) from shore, *Cunard S.S. Co. v. Mellon*, 262 U.S. 100, 122 (1923), and comprises a border for fourth amendment purposes." *United States v. Victoria-Peguero*, 920 F.2d at 80 (citing *United States v. Zurosky*, 614 F.2d at 787 n.7) ("The three mile limit [off the U.S. coast] establishes the boundary of the territorial sea and is regarded as the border.")).  Here, the CBP and MIA initially spotted the Black Sea "outside U.S. territorial waters," that is, over twenty-four miles beyond the shore. (Docket No. 52-2, at 4, ¶ 7.)  At least one of the crew members told CBP officers that the men had been "fishing approximately twenty five (25) miles offshore."  (Docket Nos. 3-2, at 1, ¶ 7; 52-2, at 4, ¶ 7; 86, at 2, ¶ 4.)

14

Defendant does not deny in his brief that the vessel was over three miles beyond the coast. Finally, CCSF intelligence indicated that the Black Sea "was going to be utilized to smuggle narcotics into Puerto Rico." (Docket No. 52-2, at 3, ¶ 4.) The weight of this evidence was sufficient to establish a "high degree or probability" and even "reasonable certainty" that the Black Sea had crossed a border.

The CBP agents also operated under reasonable suspicion of criminal activity. *United States v. Montoya de Hernández*, 473 U.S. at 537 (citing *New Jersey v. T.L.O.*, 469 U.S. 325, 337-42 (1985) ("What is reasonable depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself.")). While reasonable suspicion may develop prior to  government agents' boarding a vessel, suspicion may also "be formed on the basis of facts obtained during the safety and document inspection. . . ." *United States v. Cardona-Sandoval*, 6 F.3d at 23. The evidence demonstrates that the CBP agents operated pursuant to a reliable source of information that indicated the Black Sea was being used to traffic narcotics. The agents observed that Black Sea was traveling at high speeds, in rough seas, at night. After boarding the vessel, crew members delivered discrepant accounts of the boat's port of origin. (Docket No. 52-2, at 4, ¶ 7.) During the inspection, a K-9 gave a positive indication of the presence of cocaine. Accordingly, the agents had reasonable suspicion that criminal activity was taking place. *See United States v. Montoya de Hernández*, 473 U.S. at 542 (quoting *New Jersey v. T.L.O.*, 469 U.S. at 346) (sixteen hour extended border search was warranted where customs inspectors "had encountered many alimentary canal smugglers" and where  "inspectors' suspicion" that defendant was such a smuggler was nothing more than a "'common-sense conclusio[n] about human behavior' upon which 'practical people,' –including government officials, are entitled to rely.").

Not only was the border search itself appropriate, but its location in the marina at Palmas del Mar was also justified. "Because it is not practical to set up checkpoints at the outer perimeter of a country's territorial waters, courts have consistently recognized the constitutionality of warrantless searches at the functional equivalent of the sea border. . . . " *United States v. Victoria-Peguero*, 920 F.2d at 80 (police boarding and search of vessel approximately 1.5 miles off the coast was appropriate) (citing *United States v. Tilton*, 534 F.2d 1363, 1365-66 (9th Cir. 1976) ("harbor as functional equivalent of border.")). "The border search exception is not limited to searches that occur at the border itself but includes searches that take place at the 'functional equivalent' of a border. . . ." *United States v. Momoh*, 427 F.3d at 143. The functional equivalent of a border includes a marina. *United States v. Thomas*, 257 F. Supp. 2d 494, 497 (D.P.R. 2003) ("That the search occurred in the pier 10 area does not render it unreasonable, for it serves as the functional equivalent of the border."). Here, it would not have been practicable for customs to set up a check point

exactly at the three miles' distance from the coast, especially at night under rough seas. A search in the protected Palmas del Mar marina was far more reasonable. Thus, under *United States v. Thomas*, the border search in that marina was appropriate under the Fourth Amendment.

In *United States v. Whitted*, 541 F.3d 480, 484-486 (3rd Cir. 2008), the Court denied defendant's motion to suppress drugs seized during a search of his cruise ship cabin. The cabin search was conducted in the absence of Whitted. The Court of Appeals affirmed, and held:

> Searches conducted at the nation's borders, however, represent a well-established and long-standing exception to the warrant requirement. *United States v. Ramsey*, 431 U.S. 606, 619 (1977); *see also United States v. Flores-Montano*, 541 U.S. 149, 152-53 (2004). **The exception applies not only at the physical boundaries of the United States, but also at the "the functional equivalent" of a border**, *Almeida-Sánchez v. United States*, 413 U.S. 266, 272-73 (1973), including the first port where a ship docks after arriving from a foreign country, *United States v. Smith*, 273 F.3d 629, 633 n. 8 (5th Cir. 2001). The search here, conducted as the Adventure of the Seas arrived in St. Thomas from St. Maarten, was therefore a border search.

> **Provided that a border search is routine, it may be conducted, not just without a warrant, but without probable cause, reasonable suspicion, or any suspicion of wrongdoing**. *United States v. Montoya de Hernández*, 473 U.S. 531, 537 (1985); *see also United States v. Glasser*, 750 F.2d 1197, 1201 (3rd Cir. 1985). **This is because the expectation of privacy is "less at the border than in the interior" and "the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is ... struck much more favorably to the Government**." *United States v. Hyde*, 37 f.3d 116, 119-20 (3d Cir. 1994). Even at the border, however, an individual is entitled to be free from unreasonable search and seizure and his or her privacy interests must be balanced against the sovereign's interests. *Id.* Consequently, certain searches, classified as "nonroutine," require reasonable suspicion of wrongdoing to pass constitutional muster. *Montoya de Hernández*, 473 U.S. at 541. **Border searches thus fall into two categories: "routine searches that require no suspicion and nonroutine searches that require reasonable suspicion**." *Bradley v. United States*, 299 F.3d 197, 204 n. 4 (3d Cir. 2002).

> The question here, therefore, is not whether the customs officers were required to have a warrant or probable cause in order to search Whitted's private cabin, but, rather, whether reasonable suspicion was necessary. The parties agree that no suspicion is required in order for a customs officer to board and search the cruise ship as part of a routine border search. They

16

disagree, however, as to whether any Fourth Amendment protection applies to a search of a private sleeping cabin aboard a cruise ship. (Emphasis ours).

As to "reasonable suspicion" and expectation of privacy in a border search, the Court in *Whitted* held:

> **Reasonable suspicion is not a high standard that will prevent customs officers from detecting drug smuggling at our borders. Rather, it sets a relatively low threshold that will continue to permit the kind of cabin searches customs officers currently conduct**.
>
> . . .
>
> **Under the reasonable suspicion standard, customs officers are required to have a "particularized and objective basis" to suspect illegal activity in order to conduct a search**. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). The officers must be able to articulate reasons that led to the search of the cabin that are indicative of behavior in which most innocent people do not engage. *See Karnes v. Skrutski*, 62 F.3d 485, 493 (3d Cir. 1995). We consider the totality of the circumstances in determining whether reasonable suspicion existed at the time of the search. *Arvizu*, 534 U.S. at 274. Accordingly, although each individual factor alone may be consistent with innocent behavior, it is sufficient if together they "serve to eliminate a substantial portion of innocent travelers." *Karnes*, 62 F.3d at 493.
>
> . . .
>
> **As the Supreme Court has instructed, "'the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts**.'" *United Stated v. Sokolow*, 490 U.S. 1, 10 (1989) (quoting *Illinois v. Gates*, 462 U.S. 213, 243-244 (1989)).
>
> . . .
>
> Accordingly, we conclude that the agents had reasonable suspicion to search Whitted's cabin and its content, and did not run afoul of the Fourth Amendment in the context of a nonroutine search at the border. (Emphasis supplied).

541 F.3d at 489, 490-491.

In the instant case, the Court finds that the agents had reasonable suspicion to conduct the search of

the vessel Black Sea, based upon: (a) information that the Black Sea "would be utilized at some point to

17

smuggle narcotics into Puerto Rico;" (b) inconsistent statements from the crew members; (c) the agents opted to conduct a sweep of the Black Sea with a K-9 named Hugo, and "Hugo 'had a positive hit in the master bedroom deck,'" and (d) the fact that the agents "observed a sea vessel heading east of the South coast of Puerto Rico, 'outside U.S. territorial waters.'" *See* Docket No. 105, page 2. "The parties agreed that the boat was traveling through rough seas, and according to the government, 'the vessel was traveling at high speeds.'" *Id.* Moreover, the Government alleges that "a GPS device aboard the Black Sea demonstrates that a trip to the Dominican Republic in February 2009 had been planned for the vessel ... but the device was turned off on February 14, 2009." *See* Docket No. 105, page 6. The Court notes that the defendant failed to challenge the Government's statement with any affirmative or positive evidence.

In view of the foregoing, the Court further finds that the federal agents had a sufficient degree of suspicion that warranted the search of the Black Sea. At the time that the initial search was conducted , on February 25, 2009, defendants Franki and Cardona were crew members of the pleasure vessel Black Sea. The record shows that all crew members were free to leave the vessel after the initial search concluded on February 25, 2009. This fact stands uncontested by the defendants. Hence, the defendants' objection as to a possible violation claim under the Fourth Amendment is denied.

(4) The Magistrate Judge erred when concluding that "the importation charge should not be dismissed because defendant did not demonstrate that the drugs came into the United States from another place within United States." *See* Docket No. 111, pages 19-21. For easy reference, the analysis of the Magistrate Judge is incorporated herein:

> Franki-Irizarry also argues that the narcotics importation charge against him should be dismissed because the Black Sea did not come from a location outside the United States. Section 952(a) of Title 21 of the *United States Code*, entitled "importation of controlled substances," provides that "[i]t shall be unlawful to import into . . . the United States from any place outside thereof, any controlled substance . . . . " 21 U.S.C. § 952(a). Defendant points out that "the importation statute does not apply to the shipment . . . from one part of the United States and its customs territory . . . to another." *United States v. Ramírez-Ferrer*, 82 F.3d 1131, 1144

18

(1st Cir. 1996) ("a defendant can defeat an importation charge by demonstrating affirmatively by competent evidence that the drugs came into the United States directly from another place that is also within the United States."). He argues that the Black Sea's course was from La Parguera, Puerto Rico to Palmas del Mar, Puerto Rico, and that the importation statute is therefore inapplicable. (Docket No. 52, at 17.) There is, however, a factual question as to the veracity of that claim. While one Black Sea crew member told federal agents that the vessel's trip had originated in La Parguera, another stated that it originated in Ponce, Puerto Rico, and the vessel's captain allegedly stated at one point that it originated in Cabo Rojo, Puerto Rico. The government, meanwhile, contends that the vessel in fact came from the Dominican Republic. (Docket No. 86, at 7.) In light of such an uncertain factual scenario, it cannot be said that defendant has demonstrated affirmatively by competent evidence that the drugs came into the United States from another place that is within the United States. Accordingly, he has not established that the importation charge against him should be dismissed at this time.

The Court adopts and incorporates the analysis made by the Magistrate Judge. The Court further notes that it is an uncontested fact that illegal controlled substances were found on board the Black Sea, since the initial search was conducted. Defendants, however, have been unable to contest this fact with affirmative and positive evidence, as to its origin. Hence, the defendant's objection is denied.

(5) The Magistrate Judge erred when concluding that "the statements of appearing defendant [Franki] should not be suppressed, because they were obtained during a routine inspection and boarding of a vessel." *See* Docket No. 111, page 9. The Court adopts and incorporates the analysis made by the Magistrate Judge. *See* Docket No. 105, pages 21-23. For easy reference, said analysis is incorporated herein:

> Franki-Irizarry next argues that the statements he made to customs agents on February 25, 2009 should be suppressed under *Miranda v. Arizona*, because he was detained and unable to leave the area of the sea vessel. (Docket No. 52, at 27.)

>> [A] person questioned by law enforcement officers after being "taken into custody or otherwise deprived of his freedom of action in any significant way" must first "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Statements elicited in noncompliance with this rule may not be admitted for

19

certain purposes in a criminal trial. An officer's obligation to administer *Miranda* warnings attaches, however, "only where there has been such a restriction on a person's freedom as to render him 'in custody.'" In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but "the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."

*Stansbury v. California*, 511 U.S. 318, 322 (1994) (citations omitted). "It is well recognized that a routine inspection and boarding of an American flagship vessel . . . does not give rise to a custodial detention." *United States v. Vilches-Navarrete*, 523 F.3d at 15 (quoting *United States v. Elkins*, 774 F.2d 530, 535 n.3 (1st Cir. 1985)). This is true even where defendants are "confined to one section of the boat during [a] lengthy Coast Guard inspection. . . . " *United States v. Elkins*, 774 F.2d at 535 n.3; *United States v. Nai Fook Li*, 206 F.3d at 83 (Coast Guard's boarding and inspection of ship with the crew's consent was not custodial in nature, even where crew was relegated to one section of ship) (citing *United States v. Rioseco*, 845 F.2d 299, 303 (11th Cir. 1988).

Here, the CBP agents boarded the Black Sea and performed a routine inspection. Defendant claims that he and his co-defendants were not free to leave the vessel, but the same was true of the defendants in *United States v. Nai Fook Li* and *United States v. Rioseco* when they were relegated to a certain section of the ship. The agents never placed any crew members under arrest, and defendant was free to go within hours of the vessel's being boarded. Accordingly, Franki-Irizarry was not in custody for purposes of Miranda, and his statements to CBP agents need not be suppressed.

In the instant case, the facts clearly show that defendants Franki and Cardona were on board the Black Sea on February 25, 2009, but were not arrested or placed under custody by the agents while the initial search was conducted, thus, the *Miranda* warnings need not be provided at that time. It is also uncontested by Franki and Cardona, that they never returned to the vessel on the days following the initial search. Indeed, according to the facts, and uncontested by the defendants herein, Franki and Cardona met with the federal agents again on the date of their arrest, that is, March 5, 2009. Hence, the Court finds that the statements made by Franki and Cardona on February 25, 2009, were voluntary, and need not be suppressed, as they were never arrested or placed under custody during the initial search of the Black Sea.

20

C.    **Legal Analysis of the Report and Recommendation II (Docket No. 141)**:

Our analysis will begin with an argument made by the Government in its *Response To Defendants'*

*Motions To Dismiss And Suppress* (Docket No. 86, page 3):

> Defendant's disagreement with the Magistrate Judge's conclusion, by itself, does not give him a right to have a second bite of the apple.  As stated by the First Circuit Court of Appeals in *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 991 (1st Cir. 1988): "The role played by magistrates within the federal judicial framework is an important one. They exist 'to assume some of the burden imposed [on the district courts] by a burgeoning caseload.'  The system is premised on the notion that magistrates will 'relieve courts of unnecessary work.'   Systemic efficiencies would be frustrated and the magistrate's role reduced to that of a mere dress rehearser if a party were allowed to feint and weave at the initial hearing, and save its knockout punch for the second round." ...  In the instant case, the defendant already raised his claim to the Magistrate Judge. The Magistrate Judge, after duly considering it, rejected the same. Defendant's disagreement should be noted, but should not have any consequences upon the Magistrate Judge's conclusion, absent a showing that the Magistrate Judge was incorrect.

After a careful review of the Andújar's and Rodríguez' motions; the Magistrate Judge's *Report and*

*Recommendation II*; the defendants' objections; and, the Government's response, the Court finds that the

claims made by Andújar and Rodríguez are the same, or similar in nature as Franki's and Cardona's claims,

which were already addressed by the Magistrate Judge in his *Report and Recommendation I* (Docket

No. 105).  Hence, the Court finds that the objections of Andújar and Rodríguez are just a rehash of Franki's

and Cardona's objections, or as stated by the Government, "a second bite at the apple."

Notwithstanding, the Court will review the objections of defendants' Andújar and Rodríguez (Docket

entries No. 148, 151, 152), under the same findings of fact made by the Magistrate Judge, and incorporated

herein.  *See infra* 5-8.

(1) The Magistrate Judge erred when he concluded that the search of the Black Sea conducted by

the agents without a warrant on February 25, 2009 was "appropriate under the Fourth Amendment," as it

results of a border search.  "The question here is whether the search of the defendant and the Black Sea

occurred during a 'border search' and, therefore, was legally done without a search warrant." *See* Docket No. 148, page 7. Defendants further allege that "Customs Border Patrol agents' reasonable suspicion notwithstanding, the warrantless search that began on February 25, and continued until March 2, 2009, was unconstitutional unless it was a *bona fide* border search." *Id.* The analysis made by the Magistrate Judge in the *Report and Recommendation II* (Docket No. 141, pages 13-20), is adopted and partially incorporated herein:

> Co-defendant Walter Andujar-Aponte does not contend that from the time he and the other defendants were detained, while on board the vessel on February 25, 2009, Palmas del Mar Marina became the functional equivalent of a border. What he does argue is that what was allegedly a border search in its inception became a fiction when he and the other defendants were allowed to go their ways after no illegal contraband was found, wile the Black Sea remained docked. (*Id.* at 10, ¶ 2.) The United States on the other hand holds that the border search was still in effect because the entry reporting requirements were never completed. (Docket No. 86, at 4, ¶ 1.)

For the reasons set forth in the Court's analysis on a border search, the objection is denied. *See infra* 13-18.

(2) The Magistrate Judge erred when he concluded that the statements made by Andújar, the captain of the Black Sea at the time, during a routine border inspection should not be suppressed. The Court adopts and partially incorporates herein the analysis made by the Magistrate Judge in the *Report and Recommendation II* (Docket No. 141, pages 20-22):

> Andujar-Aponte next argues that the statements he made to customs agents on February 25, 2009 should be suppressed because they were made while being detained at Palmas del Mar Marina without any procedural safeguards being used to guarantee that he had been informed of, and freely waived the Constitutional privileges of the Fifth Amendment.
>
> "The Fifth Amendment requires that an accused in custody be informed of important constitutional rights before the authorities interrogate him." *Oregon v. Elstad*, 470 U.S. 298, 347 (1985). "This requirement serves to combat the 'inherently compelling pressures' of custodial questioning 'which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely,' and is a prerequisite

to securing the accused's informed and voluntary waiver of his rights." *Id.* at 347-48 (quoting *Miranda v. Arizona*, 384 U.S. at 467).   "Far from serving merely as a prophylactic safeguard, '[t]he requirement of warnings and waiver of rights is a fundamental with respect to the Fifth Amendment privilege . . . .'" Id. at 347 (quoting *Miranda v. Arizona*, 384 U.S. at 476). Accordingly, the court in *Stansbury v. California* held that:

> [A] person questioned by law enforcement officers after being "taken into custody or otherwise deprived of his freedom of action in any significant way" must first "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."   Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial.  An officer's obligation to administer *Miranda* warnings attaches, however, "only where there has been such a restriction on a person's freedom as to render him 'in custody.'"  In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but "the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."

*Stansbury v. California*, 511 U.S. 318, 322 (1994) (citations omitted). However, "[i]t is well recognized that a routine inspection and boarding of an American flagship vessel . . . does not give rise to a custodial detention." *United States v. Vilches-Navarrete*, 523 F.3d 1, 15 (1st Cir. 2008) (quoting *United States v. Elkins*, 774 F.2d 530, 535 n.3 (1st Cir. 1985)).  This is true even where defendants are "confined to one section of the boat during [a] lengthy Coast Guard inspection . . . ."  *United States v. Elkins*, 774 F.2d at 535 n.3; *United States v. Nai Fook Li*, 206 F.3d 78, 83 (1st Cir. 2000) (Coast Guard's boarding and inspection of ship with the crew's consent was not custodial in nature, even where crew was relegated to one section of ship) (citing *United States v. Rioseco*, 845 F.2d 299, 303 (11th Cir. 1988)).

Andujar-Aponte's contention that he was detained is of no consequence because as in this case the defendants in *United States v. Nai Fook Li* and *United States v. Rioseco* were detained when they were relegated to a certain section of the ship.  The agents in those cases never placed any crew members under arrest, and defendants were free to go within hours of the vessel's being boarded.  Cf. *United States v. Cardona-Sandoval*, 6 F.3d at 21 (defendants detained in a barred cage during part of a six-day search). Here, the CBP agents boarded the Black Sea and performed a routine inspection. Andujar-Aponte as well as the other defendants were not in custody for purposes of Miranda.   Thus, the statements made by

Andujar-Aponte to CBP agents need not be suppressed.

The Government alleges in its opposition that "[a]t no time has Andújar-Aponte stated that he did not say they were 25 miles off the coast of Puerto Rico."  *See* Docket No. 160, page 7.  "Defendant Rodríguez-Sorrentini just claims that the statements are not included in the reports of investigations."  *Id.* "They have not claimed that the statements were not made.  The Magistrate Judge can properly rely on the representations in the affidavit that the statements were made."  *Id.*  The Court agrees.

For the reasons set forth in the Court's analysis on why the suppression of the crew members' statements is not warranted, the defendants' objection is denied.  *See infra* 19-20.

(3) The Magistrate Judge erred when he concluded that a suppression hearing was not warranted on the Rodríguez' motion to suppress under *Franks v. Delaware* (Docket No. 70).   "The Magistrate Judge determined that probable cause for the search warrant can be based on two factors, not covered in the motion to suppress, namely that (1) the K-9 gave a positive response to certain areas of the vessel, and (2) that the search found ten brand new duffel bags, several zip lock bags, one package of vacuum sealed bags and several bottles of odor swipes."  *See* Docket No. 152, page 3.  The Court adopts and partially incorporates herein the analysis made by the Magistrate Judge in the *Report and Recommendation II* (Docket No. 141, pages 22-26):

> Co-defendant Anthony Rodríguez Sorrienti contends that the search warrant was based upon an affidavit that contained material allegations that were knowingly or recklessly false and misleading, in violation of *Franks v. Delaware*, 438 U.S. 154 (1978).  (Docket No. 70, at 1, ¶ 3.)  The defendant further argues that the good faith exception does not apply here because the government was not acting in objective good faith.  (Id. at 2, ¶ 4.)  Thus, the defendant believes that the evidence seized pursuant to the warrant should be suppressed.  Id.  The defendant therefore requests a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).
>
> "A defendant is entitled to an evidentiary hearing under [*Franks v. Delaware*] where the defendant 'makes a substantial preliminary showing' that both (1) 'a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit' and (2) 'the allegedly false statement is necessary to the finding

24

of probable cause.'"  *United States v. Reiner*, 500 F.3d 10, 14 (1st Cir. 2007), *cert. denied*, 128 S. Ct. 1737 (2008) (quoting *Franks v. Delaware*, 438 U.S. at 155-56).  Both elements are essential to establish the necessity of a Franks hearing.  However, even "when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required."  *Franks v. Delaware*, 438 U.S. at 171-72.

The defendant focuses on four particular statements that according to him are false, and were included knowingly and intentionally and/or with reckless disregard for the truth in the affidavit.  First, the defendant argues that the Black Sea was not sighted outside United States territorial waters because according to the co-ordinates shown in a photograph taken by a law enforcement airborne asset, the vessel was approximately 3.5 miles from Aguirre ward, Salinas, Puerto Rico.  Second, the defendant states that there are no conflicting statements because the United States has only disclosed a report of investigation of a post arrest interview by co-defendant Gabriel Franki Irrizary, which did not make any reference as to having traveled outside United States waters.  Third, he argues that the court was misled into believing that the search of the Black Sea was by consent, or that an absolutely warrantless search was being held because the affidavit failed to state that the vessel had been seized by ICE.  Fourth, he argues that no alterations were made to the boat because attorney Ramón Garay was informed that there were no modifications to the tanks, nor were there different paint jobs on the tanks.  However, the defendant failed to establish that these statements were necessary in finding probable cause.

In this case there is no need for an evidentiary hearing because when the statements which are the subject of the alleged falsity or reckless disregard are set aside, the fact is that there still remains sufficient content in the warrant affidavit to support a finding of probable cause.  There were at least two sound bases for finding probable cause to justify the search warrant, and defendant does not challenge the veracity or reliability of either.  First, the K-9 Hugo gave a positive indication of the presence of narcotics aboard the vessel.  According to the Department of Homeland Security, the K-9 was "reliable in the detection of [cocaine] . . . . " (Docket No. 86-3.)  A "positive alert from a canine sniff may be used as probable cause to obtain a warrant . . . . "  *United States v. Carreras*, 851 F. Supp. 502, 505 (D.P.R. 1994) (citing *United States v. Sokolow*, 490 U.S. 1 (1989)) ("probable Cause [sic] to arrest individuals suspected of transporting illegal drugs in an airport may be proven with 'evidence of a strong alert by a narcotics dog [to the odor of drugs in a specific container], evidence that the dog was reliable and evidence linking the container to the individual arrested.'") (quoting *United States v. Colón*, 845 F. Supp. 923, 928 (D.P.R. 1994)).  As such, the evidence from the K-9 alone was sufficient to justify the search warrant and no other statement in the affidavit was necessary to the finding of probable cause. Defendant fails to contest the reliability or

veracity of the dog's alert, and therefore fails to identify a false statement within the affidavit necessary to the finding of probable cause. *See United States v. Brown*, 500 F.3d 48, 57 n.3 (1st Cir. 2007) .

A second legitimate basis for the issuance of the warrant was the affidavit's reference to the ten brand new black duffle bags, several packages of Ziploc brand bags, one package of vacuum sealer bags, and several plastic bottles of odor wipes. (Docket No. 52-2, at 4, ¶ 8.) "[T]he presence on the same premises of an unusually large number of zip lock plastic bags . . . combined with [an agent's] extensive experience as a law enforcement officer [may] plainly buttress[ ] the informant-based indicia of probable cause." *United States v. Taylor*, 985 F.2d 3, 6 (1st Cir. 1993). Here, the presence of several packages of Ziploc brand bags, vacuum sealer bags, and several bottles of odor wipes is certainly unusual and appears inconsistent with defendants' ostensible reason for the sea voyage: a fishing excursion. The items are "consistent with recent seizures made on pleasure vessels used to smuggle narcotics" according to the warrant affidavit by ICE Special Agent Gregory. (Docket No. 52-2, at 4-5, ¶ 8.) Special Agent Gregory has been a special agent with ICE for seven years, and "the issuing magistrate properly may credit the experience and pertinent expertise of a law enforcement affiant in evaluating the authenticity of the informant's description of the target's modus operandi." *United States v. Taylor*, 985 F.2d at 6 (finding warrant affidavit sufficiently supported probable cause to search defendant's premises). Much like the affidavit's averments as to the K-9, the allegation that various bags and deodorizing items were aboard the Black Sea was sufficient in itself to provide probable cause for a search warrant. Defendant does not contest the veracity or reliability of that allegation, and he is therefore not entitled to a *Franks v. Delaware* hearing.

As to Rodríguez' argument of lack of corroboration of the source of information, the Court adopts and incorporates herein the Magistrate Judge's analysis. *See* Docket No. 141, pages 26-30.

Rodríguez-Sorrienti further argues that: (1) the affidavit makes continuous reference to a source of information but that it cannot be determined if it is referring to a single source of information or to various individuals; (2) the affidavit provides no reference about any actions taken by the officers to evaluate the credibility of the source of information; (3) the source was not personally interview by agent Watson; (4) no evaluation was made of the source's background to adequately evaluate his trustworthiness; (5) there is no information about the sources's prior record, or the reason why he knew the information.

"'Probable cause exists when "the affidavit upon which a warrant is founded demonstrates in some trustworthy fashion the likelihood that an offense has been committed and that there is sound reason to believe that

a particular search will turn up evidence of it" or that the search will turn up contraband.'" *United States v. Stewart*, 183 F. Supp. 2d 91, 101 (D. Me. 2002) (quoting *United States v. Schaefer*, 87 F.3d 562, 565 (1st Cir. 1996) (quoting *United States v. Aguirre*, 839 F.2d 854, 857-58 (1st Cir.1988)). "An affidavit supporting a request for a search warrant must give the reviewing judge a 'substantial basis' upon which to conclude that there is such a 'fair probability.'" *United States v. Stewart*, 183 F. Supp. 2d at 101 (quoting *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983)). Where the finding of probable cause depends on information supplied by an informant, courts review the determination in light of the fallowing factors:

> whether an affidavit supports the probable veracity or basis of knowledge of persons supplying hearsay information; whether informant statements are self-authenticating; whether some or all of the informant's factual statements were corroborated wherever reasonable and practicable (e.g., through police surveillance); and whether a law-enforcement affiant included a professional assessment of the probable significance of the facts related by the informant, based on experience or expertise.

*United States v. Torres-Rosario*, 588 F. Supp. 2d 128, 131 (D. Mass. 2008) (quoting *United States v. Zayas-Díaz*, 95 F.3d 105, 111 (1st Cir. 1996)). Since "[n]one of these factors [are] indispensable . . . stronger evidence on one or more factors may compensate for a weaker or deficient showing on another." Id. "When an affidavit relies on the reports of unnamed informants, it must include some information by which the reviewing judge can assess the credibility of the information those informants provide." *United States v. Stewart*, 183 F. Supp. 2d at 101 (citing *United States v. Capozzi*, 91 F. Supp. 2d 423, 431 (D. Mass. 2000) (citing *Illinois v. Gates*, 462 U.S. at 227). "It is not necessary for a warrant affidavit to state an informant's previous reliability; rather the appropriate inquiry is whether the informant's present information is truthful or reliable." *United States v. Stewart*, 183 F. Supp. 2d at 101 (citing *United States v. Harris*, 403 U.S. 573, 581-82 (1971)).

In this case the government failed to provided any background information on its sources of information. The information provided by the SOI's reliability and credibility is neither supported nor referred to in the affidavit. This however does not mean that the affidavit failed to establish probable cause to search the vessel for evidence of contraband since the finding of probable cause does not rely solely on the information provided by the SOI. The affidavit recounts the events that had taken place which ultimately lead to believe that the Black Sea was being used for smuggling narcotics into Puerto Rico. First, the affidavit states the CBP officers observed the Black Sea traveling at high speeds through rough seas, at around 10:30 p.m. on February 24, 2009, outside United States territorial

waters.  The affidavit also states that after making visual contact with the Black Sea as it entered the Palmas del Mar Marina in Humacao, the vessel was detained at a pier within the Marina at approximately 2:00 a.m. on February 25, 2009.  (Docket No. 52-2, at 4, ¶ 7.)  Second, according to the affidavit after the vessel was detained by CBP agents at a dock in Palmas del Mar Marina, the defendants  gave conflicting statements as to their point of origin.   Third, the affidavit also states that because of these discrepancies, the CBP officers opted to conduct a sweep of the boat with a K-9.  Upon inspecting the vessel, the K-9 gave a positive hit of narcotics present in the vessel.  Also, the affidavit stated that several packages of Ziploc brand bags, vacuum sealer bags, and several bottles of odor wipes were aboard the vessel.   These items according to the affiant were consistent with recent seizures made on pleasure vessels used to smuggle narcotics.   Thus, this statements which were made by the affiant when considered together are sufficient by themselves to provide probable cause for a search warrant.  As such the warrant was properly issued.

As to Rodríguez' argument of the *United States v. León*, 468 U.S. 897 (1994), the Court adopts and incorporates herein the analysis made by the Magistrate Judge.  *See* Docket No. 141, pages 30-34.

Rodríguez-Sorrienti also contends that the León exception to suppression of the seized evidence is inapplicable for two reasons:  (1) the warrant is based upon an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable[,]"  *United States v. León*, 468 U.S. at 923  (quoting *Brown v. Illinois*, 422 U.S. 590, 610-11 (1975)), (2) the affidavit that was relied on to issue the search warrant was deliberately and/or recklessly false.  *United States v. León*, 468 U.S. at 914 n.12.  However, I find that even if it were true that the search warrant was issued without the requisite showing of probable cause, the evidence that was seized is not to be excluded from trial under the León good faith exception.

"In [*United States v.] León* the Supreme Court held that a search warrant had been issued without a sufficient showing of probable cause."  *United States v. Hernández*, 183 F. Supp. 2d 468, 478 (D.P.R. 2002) (citing *United States v. León*, 468 U.S. at 906).   Nevertheless, "the Court refused to exclude the fruits of the search based on that fact."  Id.  Also, "[t]he opinion explained that the exclusionary rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved."  Id.  "Whether the exclusionary sanction is appropriately imposed in a particular case, our decisions make clear, is 'an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct.'"  Id. (quoting  *United States v. León*, 468 U.S. at  906) (quoting *Illinois v. Gates*, 462 U.S. at 223).  "The Court in Leon concluded, then, that suppression of evidence obtained pursuant to

a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purpose of deterring police misconduct."  *United States v. Hernández*, 183 F. Supp. 2d at 478 (quoting *United States v. León,* 468 U.S. at 918).  "Hence, when an officer relies in good faith on the magistrate's issuance of a warrant, and conducts a search which he believes is legal, the evidence will not be excluded, since no deterrent purpose can be furthered.  This is what is known as the good faith exception."  *United States v. Hernández*, 183 F. Supp. 2d at 478.

"Under *León*, the 'government bears the burden of showing that its officers acted with good faith.'"  Id. at 478-79 (quoting *United States v. Brunette*, 256 F.3d 14, 17 (1st Cir. 2001)).  "To make this assessment, we evaluate all of the attendant circumstances at the time of the warrant application and its execution." Id. Therefore, "objective good faith reliance turns on the totality of the circumstances, but in *León*, the Supreme Court indicated four situations in which reliance on the police would not be reasonable." *United States v. Hernández*, 183 F. Supp. 2d at 478-79 (citing *United States v. León*, 438 U.S. at 922-23).  "In all of them, good faith is absent:  1) the information provided by the officer in the affidavit is deliberately misleading or provided with reckless disregard; 2) the issuing magistrate ceased to play a neutral role; 3) the affidavit is so lacking in indicia of probable cause that the officer's belief is entirely unreasonable; 4) the warrant is so defective that the officer who executed it could not presume it was valid." Id.  The defendant does not claim that the magistrate judge was in any way prejudiced or that the warrant was defective in any way. Nevertheless, the defendant believes that of the four situations mentioned here, which might preclude the application of the good faith exception, the first and the third situation are present in this case.  They are not.  The United States addresses in its motion the first of these four situations. According to the United States, the court was not intentionally misled in any detail in the affidavit, since the statements made by the affiant were based on the information that was provided to him by other agents.  The government states that the affiant was told that:  (1) the vessel was observed in international waters, and (2) of  the findings of the search conducted by the CBP search team of the tanks and paint.  Also, the government holds that the affiant did not make any comment stating that no alterations were made on the vessel's fuel tank nor that they appeared to be painted.  As such, the statements that the defendant focuses on fail to establish that they were included knowingly and intentionally or with reckless disregard for the truth by the affiant.  Also I disagree with the defendant's assertion that the warrant is based upon an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.  The defendant relies heavily on the fact that the affidavit makes continuous reference to a source of information whose reliability and credibility was neither supported nor referred to in the affidavit.  Regardless, it has already been established that this did not mean that the affidavit failed to establish probable cause to search the vessel for

evidence of contraband, since the finding of probable cause does not rely solely on the information provided by the source of information, and that the statements made by the affiant regarding the conflicting testimonies given by the defendants as to where they were coming from, which lead CBP officers to believe that they where in international waters, the K-9's positive indication of narcotics present in the vessel as well as that several packages of Ziploc brand bags, vacuum sealer bags, and several bottles of odor wipes that were later found aboard the vessel provided more than probable cause for issuing the search warrant. Accordingly, I find that based on the totality of the circumstances the officers in this case acted with a good faith reasonable belief that the warrant was not defective. Both defendants' motions lack merit. Therefore, the evidence seized and the statements given cannot be suppressed.

The Government alleges that a suppression hearing is not warranted, as Rodríguez has not challenged the finding of lack of bad faith under *León* made by the Magistrate Judge. *See* Docket No. 141, page 8.

As to the third prong of the Magistrate Judge analysis; that is, the conclusion that, even if the search warrant was issued without probable cause, the evidence seized was not to be excluded under the *León* good faith exception doctrine, the defendant has not challenged the explanation given by the government and accepted by the Magistrate Judge as to the lack of bad faith. Instead the defendant just wants to have a hearing in which the agent himself reiterated the same explanation uttered by the government. Under this circumstance, no hearing is warranted.

The Court agrees, and will not disturb the analysis and findings made by Magistrate Judge Arenas. After a careful review of the defendants' objections, the Court finds that their arguments are a rehash of the claims already presented to the Court in their motions to dismiss and/or suppress, and thoroughly entertained by the Magistrate Judge. *See Reports and Recommendations I and II* (Docket entries No. 105 and 141). Hence, the defendants' objections are denied.

## A Final Note

The core of this matter is whether or not the border search of the Black Sea and the issuance of the search warrant are constitutional within the guarantees provided by the Fourth Amendment. Based on the analysis made by the Magistrate Judge, as supplemented herein, the Court finds that both the border search and the issuance of the search warrant pass muster under constitutional challenge. Hence, the border search

and warrant are found to be constitutionally warranted as both met the probable cause standard.

### Conclusion

For the reasons set forth herein, the *Reports and Recommendations I and II* (Docket No. 105 and 141) are adopted *in toto*, as supplemented herein.[2]  After having reviewed *de novo* the objections filed by defendants Andújar, Franki, Cardona and Rodríguez (Docket entries No.  111, 126, 148, 151, 152), the objections are denied.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 10th day of February, 2010.

s/Daniel R. Domínguez
DANIEL R. DOMINGUEZ
U.S. District Judge

---

[2]        "The Court need not go further for it refuses to write at length to no other end than to hear its own words resonate as to the instances alleged as errors by plaintiff." Where as here, a [Magistrate] has produced a first-rate work product, a reviewing tribunal should hesitate to wax longiloquence simply to hear its own words resonate." *See Lawton v. State Mut. Life Assu. Co. Of Am.*, 101 F.3d 218, 200 (1st Cir. 1996); *In Re San Juan Dupont Plaza Hotel Fire Litig.*, 989 F.2d 36, 38 (1st Cir. 1993).